## THE BRITANNIC.

### THE CELTIC.

BRITISH & FOREIGN MARINE INS. CO., Limited, *et al. v.* THE BRITANNIC AND THE CELTIC. UNIVERSAL MARINE INS. CO. *v.* SAME.

*(District Court, S. D. New York. July 3, 1889.)*

1. COLLISION—FOG—EXCESSIVE SPEED—CHANGE OF COURSE—REVERSING.

In fog so thick that vessels cannot be seen within a quarter of a mile of each other, when fog-signals are heard almost ahead and near, (in this case within three-quarters of a mile,) steamers proceeding at about full speed are bound at once to stop and reverse, and not to change their courses without knowing the position or direction of the other.

2. SAME.

The steamer B., with the libelants' goods on board, bound from New York to Liverpool, and the C., from Liverpool to New York, both belonging to the White Star Line, came in collision at sea, about 365 miles out from New York. The C. was in a dense fog. the B. in a fog less dense, but the vessels could not be seen until within 300 or 400 yards of each other. They were going under a full speed "stand by," from 13½ to 14½ knots each. Fog-signals were first heard about two minutes before collision. The C., on hearing the B.'s first signal, slowed: on hearing the second signal, starboarded; and, when the B. was seen, she at once reversed, about half a minute before collision. The B., on hearing the C.'s first signal ahead, first ported, and then came up towards her course, and, on hearing the second signal a minute after the first, hard a-ported, and kept on at full speed till the collision. There would have been no collision had either vessel kept her course, or reversed at once. *Held*, both in fault, (*a*) for immoderate speed in fog; (*b*) for not reducing speed as much as possible when the first signals were heard; (*c*) for keeping on and changing their courses, without knowing the position or heading of the other.

3. SAME—BILLS OF LADING—EXCEPTIONS OF NEGLIGENCE—NEGLIGENCE OF ANOTHER VESSEL OF SAME OWNERS.

Exceptions in the bills of lading of damage "by collision, * * * even when occasioned by negligence of the master or other servants of the ship-owners," apply only to negligence of the master or ship-owners' servants connected with the vessel on which the goods were shipped, or with the performance of the contract of transportation, and do not exempt the owners from liability for the negligence of another ship belonging to the same owners by which the goods were damaged.

**4. SAME—PRACTICE—JOINT STIPULATION.**

> Under the law of this country making each vessel liable *in solido* in case of collision by mutual fault, the owners of the C. are liable for the whole damage to the goods on the B., whether the exception in the B.'s bill of lading is valid or not; and both vessels being released under one stipulation for value in a gross sum, the libelants are entitled to full recovery, without determining the validity of the exceptions.

In Admiralty. Libel for damage to cargo. ·

*Butler, Stillman & Hubbard* and *Wm. Mynderse,* for libelants.

*Wheeler & Cortis,* for claimants.

BROWN, J. The above libels are filed by the insurers of cargo shipped by Bingham Bros. and by Fearon, Low & Co. on board the steam-ship Britannic, at this port, in May, 1887, for transportation to Liverpool. When about 365 miles out from New York, the Britannic came in collision with the steam-ship Celtic, whereby the cargo of the Britannic was damaged; and the libelants, having paid the assured, became subrogated to their rights, and claim in these suits a recovery over against the steamships,—in the one case $5,418.62, and in the other $10,832.94,—on the ground that the collision arose through the negligence of both steamers. Both belong to the White Star Line, and to the same owners. The defenses are—*First,* that there was no negligence; *second,* that, if there was negligence, the vessels are not liable, because the stipulations of the bills of lading except liability for negligence of the officers, crew, and servants of the ship-owners; and, *third,* that this bill of lading, with its exception of liability for negligence, was the result of such special deliberation, negotiation, and agreement between the parties as to take the case out of the general maritime law of this country, which holds void such exceptions by common carriers.

1. Negligence. The evidence as to the facts of the collision is comparatively meager, and barren of many of those details that are commonly given in collision causes. There is little dispute as regards the main facts. The collision took place between 5 and 6 o'clock in the afternoon of Thursday, May 19th. The vessels were running on nearly opposite courses. The Celtic, coming west, was headed to the southward, and across the Britannic's course, about half a point. For three days previous the Celtic had been much of the time enveloped in fog, and she was running by dead reckoning. For some time before the collision she was sounding her fog-horn regularly at intervals of one minute. Only two of these signals were heard on the Britannic. The first whistle heard was thought to be nearly ahead, by the chief officer, who was on the bridge in charge at the time; and the helm of the Britannic was at once ported somewhat. The captain, who was in the chart-room, hearing that order, came upon the bridge, and, being told that a whistle was heard nearly ahead, ordered the helm hard a-port, but soon afterwards steadied, and ordered the vessel on her course again. Before the Celtic's whistle was heard, the Britannic's whistle had not been sounded, because, as it is said, the sun could be seen, and objects distinguished at a considerable distance upon the water. But the Celtic, when her whistle

was heard, could not be seen, and the engineer says the "stand by" was rung on 10 minutes before collision. A signal of one whistle was given in reply to the Celtic's whistle, and a minute afterwards another signal; to both of which the Celtic replied. Upon hearing the Britannic's first whistle, the Celtic's engines were reduced to "dead slow;" at the Britannic's second whistle, the Celtic gave a signal of two blasts, and starboarded her helm and swung about a point and a half to port, when the Britannic first came into view, about 300 or 400 yards distant; whereupon the Celtic reversed full speed, but the vessels came in collision, the Celtic's stem striking on the port side of the Britannic, just abaft of her engine-room bulk-head, a succession of from 6 to 10 blows, which carried away her boats, rigging, and bulwarks on that side nearly to the stern, and stove in a hole, filling one of her compartments with water. Before the signals were heard the Celtic was going at the rate of 13½ knots; the Britannic, 14½ knots. Full speed for each is about one knot greater. The Britannic did not reduce her speed at all, but when the Celtic was seen about 300 yards distant, the order was given to go ahead strong, in the hope of passing the Celtic if possible; or, if not, to lessen the force of the blow.

Experiments with the Britannic going at the rate of 12 knots show that she would come to a dead stop in 2 minutes 13 seconds, going 1,100 feet; going 15 knots, and reversing full speed, she would come to a standstill in less than 3 minutes, going 1,500 feet; and she begins to swing in 11 seconds after the order hard a-port is given. The Celtic is a sister ship, and works substantially like the Britannic; the Celtic being 437 feet long, the Britannic 455; and the latter being 5,000 tons gross tonnage, the former 3,867. The testimony does not state the heading of either vessel at the time of the collision, nor the angle of the blow. When the vessels first came in sight of each other, as Capt. Irving, of the Celtic, says, the Britannic was about four points on the Celtic's starboard bow, heading for her bridge. The master of the Britannic says that the Celtic was at that time about three or four points on his port bow, and that she seemed to come up suddenly out of a fog-bank, and was crossing his course nearly at right angles. These statements are not reconcilable. The Britannic could not be heading for the bridge of the Celtic if the latter was three to four points on the Britannic's port bow. From the testimony of Capt. Irving in regard to the whistles it is plain that the collision occurred not much, if any, more than two minutes after the Britannic's first whistle was heard. The Celtic's starboarding "a point and a half" on hearing the Britannic's second whistle would occupy only about half a minute; and the Britannic, coming then in sight, only about 300 or 400 yards distant, the reversal up to the collision could not have much exceeded a half a minute more, as the Britannic was at full speed. The engineer, Fleming, confirms this in saying that the time the Britannic was rung full speed ahead under the ring-up bell was not over a minute before collision. As it takes the Celtic, going 13½ knots, 2½ minutes to come to a stop on reversing full speed, she must have been going at the rate of nearly 5 knots, at least, at the time of the collision; for during the minute and a half that her engines were not reversed, but going

ahead slow, her speed could not have fallen from 13½ knots below 9 knots; and, as it requires 133 seconds backing at the full speed of 15 knots for her to come to a stop when going at the rate of 12 knots, computation shows that it would take about three-fourths of a minute to reduce her speed from 9 knots to 5.[1]

Assuming that the Britannic changed her course some five or six points to starboard, and the Celtic about one to port, (allowing for her swing back half a point or a point to starboard while reversing,) making the angle of collision of six to seven points, it follows that when the whistles were first heard the Britannic was from half a point to a point on the Celtic's starboard bow, and the Celtic a little less on the Britannic's starboard bow, and that the Celtic, at her second whistle, bore nearly ahead of the Britannic, as the latter was then heading. Considering that steamers like the Britannic and the Celtic, under a hard a-port or a hard a-starboard helm, change a point in a little less than a length, examination shows that the position, distance, and courses of the vessels cannot have been very materially different from the above. Capt. Irving's testimony is substantially in accord with this, except that the whistles heard were much less off his starboard bow than three points. The testimony of Capt. Perry, of the Britannic, however, that when the Celtic hove in sight she was three points on his port bow, is evidently grossly erroneous. If that were her bearing, the collision could not have happened. This was an important fact, if true, to excuse his keeping ahead at full speed, as well as his attempt to cross the Celtic's course. So important is this misstatement, (the fact being that the Celtic's stem must have been then but little, if any, on his port bow,) that it necessarily detracts from the credit to be given to Capt. Perry's testimony as to the amount of fog, or thickness of the weather, at the time and before the Celtic's whistle was heard. Though it is not impossible that the Britannic might suddenly run into a bank of fog, yet the circumstance to which Fleming testifies, that the "stand by" had been rung on 10 minutes before collision, and the fact that the Britannic did not slow at either of the two signals heard from the Celtic, though the latter could not be

---

[1] The formula submitted by counsel in reference to stopping, and the remark that "the rate of stopping increases constantly" under reversed engines, is, I think, erroneous, through not considering that when backing there is no resistance by air and water to the retarding force. On the contrary, that resistance largely aids the force of the engine. If the Celtic's full speed was 15 knots, then the resistance of air and water when she is going ahead at that speed is just equal to the whole power of the engines; otherwise she would continue to gain in speed. If she then reverses at full speed, the initial retarding force exerted upon the hull is twice the power of the engine. The force of the engine in backing is constant; the retarding force derived from the resistance of wind and water is constantly diminishing with the diminishing speed in proportion to the square of the velocity from time to time. If the power of the engine be represented by 15, the whole initial retarding force upon reversal, when going ahead at a speed of 15 knots, will be represented by 30; when reduced to 12 knots, by 24.7; when at 9 knots by 20.4; at 6 knots, by 17.4; at 3 knots by 15.6; and as it takes 133 seconds to reduce the Celtic from 12 knots to zero, she would retard from 12 knots to 9 in about 26 seconds; from 9 knots to 6 in about 31 seconds; from 6 to 3 in about 36 seconds; from 3 to zero in about 40 seconds; and from 8 knots to 4 in 45 seconds. So when, at 13½ knots, her engines being put at "dead slow" ahead, supposing even that her engine exerted no effective propulsive force, she would occupy about 102 seconds in falling to 9 knots. If she then reversed full speed for three-fourths of a minute before collision, her speed would be reduced to about 5 knots; and this is as favorable a result to the Celtic as the testimony will warrant.

seen, satisfy me that she was deliberately running at nearly full speed, though the weather was known to be thick.

Upon the above findings it follows that there would have been no collision had each vessel kept her course, or even had either done so, notwithstanding the other's changes. Collision came about (1) because both vessels were going at nearly full speed in such a fog that they could not be seen within hailing distance, and therefore could not avoid each other when they came in sight; (2) because each changed her course without knowing the position or the course of the other; (3) because, when their whistles were heard near and nearly ahead,—i. e., within three-quarters of a mile and less,—neither stopped or reversed. These were faults in each vessel alike, by the highest English authorities, as well as by our own. The duty to stop and reverse and not to change course, when a whistle is heard approaching near and ahead, in a thick fog, was affirmed in the privy council in the case of *The Frankland*, L. R. 4 P. C. 529; *The Kirby Hall*, L. R. 8 Prob. Div. 71; *The Dordogne*, L. R. 10 Prob. Div. 6, 9; *The John McIntyre*, L. R. 9 Prob. Div. 135. In the case last cited Lord BRETT says:

"It may be laid down as a general rule of conduct that it is necessary to stop and reverse, not indeed, every time that a steamer hears a whistle or foghorn, in a dense fog, but when in such a fog it is heard on either bow, and approaching, and is in the vicinity; because there must then be a risk of collision."

The same rule has been applied in this country. *The Lepanto*, 21 Fed. Rep. 651, 659; *The Pottsville*, 24 Fed. Rep. 655. Both vessels were also running in plain violation of the statute, because they were under substantially full speed in a fog. *The Colorado*, 91 U. S. 692; *The Pennsylvania*, 19 Wall. 125; *The State of Alabama*, 17 Fed. Rep. 852; *The Pennland*, 23 Fed. Fep. 555; *The City of Alexandria*, 31 Fed. Rep. 431. Though the handling of the Britannic was more flagrant and reckless in continuing on full speed after the Celtic's whistle was heard, the Celtic was probably in a denser fog, and the more to blame for maintaining nearly full speed up to the moment of hearing the Britannic. Each was in fault for not stopping and reversing, in this case, as soon as the whistle of the other was heard comparatively near. This duty was the more imperative because each was then going at nearly full speed; and each had, therefore, a double duty to repair as speedily as possible the previous fault of excessive speed, and to reduce the danger to a minimum. These faults in each vessel, moreover, contributed to the collision, plainly enough on the part of the Britannic, and clearly also on the part of the Celtic upon the facts as above found, since no collision would have occurred, notwithstanding the Britannic's faults, had the Celtic been going at say "half speed," (which for her would have been about 9 or 10 knots,) or had she promptly stopped and reversed on hearing the Britannic's first whistle, or kept her course without change until the position of the Britannic became known. *The City of New York*, 15 Fed. Rep. 624, 628, 629, 35 Fed. Rep. 604, 609. I must therefore find both vessels to blame.

The bills of lading purport to exempt the owner from liability for

"collision, stranding, or other accidents of navigation, even when occasioned by the negligence of the master or other servants of the ship-owner." If this exception were valid, and the English law applied, the libelants would be entitled to recover half their damages in the present case against the Celtic. *Chartered Mercantile Bank* v. *Navigation Co.*, L. R. 10 Q. B. Div. 521. In that case the exceptions included "collision," and the "negligence or fault of the pilots, master, or mariners, or other servants of the company, in navigating the ship." Although the language in the present bills of lading is slightly different, the words "in navigating the ship" being omitted, the meaning and legal construction are the same. The context imports negligence of the master, mariners, servants, etc., in connection with the vessel on which the goods are shipped, not those connected with any other vessels having no relations with the Britannic. The language of Lord BRETT in the case just cited is applicable as respects the subject to which these exceptions refer. "It seems to me," he says, (p. 533,) "wholly unreasonable to suppose that at the time of making the contract in this bill of lading, which is a contract not to carry the goods generally, but to carry them in a specific ship, and deliver them after having carried them in that ship, the parties were considering the conduct of the ship-owner's servants on board another ship which would not have anything to do with the carriage of these goods." And so I must hold, of this bill of lading, that it has no reference to negligence on board of other vessels, or to the masters of other vessels. It would be unreasonable to assume that the libelants intended by this clause to take the risks of damage to their goods from all other vessels that might belong to the same owners, and from all other masters and servants of theirs who had nothing to do with the Britannic or her contract of transportation. The respondents must therefore answer for the fault and the tort of the Celtic, precisely as they would be bound to answer if they were not owners of the Britannic. Under the English rule in the apportionment of damages where two vessels are in fault, as established by the decision in the case of the Milan, (1 Lush. 388,) one-half the loss only is charged upon each vessel; and it was only in consequence of this rule of practice that the libelants in the case of the *Chartered Bank of India, supra,* recovered, as in tort, the one-half of their damages. That rule of division having been rejected in this country, and the supreme court holding that each vessel is liable *in solido* for the full damage, it follows that the libelants are entitled to a decree for the full amount of their damages against the Celtic. *The Atlas*, 93 U. S. 302; *The Juniata*, Id. 337. As neither vessel is in custody, and as both were released upon one and the same stipulation in each case, it is immaterial whether one or both vessels are held. In either case the libelants in each libel are entitled to judgment for the respective amounts claimed, to be enforced against the stipulators. Without determining the question of the validity of the exceptions of negligence in the Britannic's bills of lading, under the peculiar circumstances appearing in the proofs, so elaborately argued by the eminent counsel in the case, I direct judgment for the libelants on the above grounds, with costs.