FABRE v. CUNARD STEAMSHIP CO., Limited.

Circuit Court of Appeals, Second Circuit. October 4, 1892.)

No. 45.

1. COLLISION—BETWEEN STEAMSHIPS—FOG.

The steamship Umbria, capable of 19½ knots per hour, bound from New York to Liverpool, having passed Sandy Hook and discharged her pilot, was on a course E. by S. ¾ S., about six miles off Rockaway beach, Long Island, running full speed in a dense fog, sounding her whistle every minute or two. A faint whistle was heard, which seemed to be two or three points on her starboard bow. She was then slowed a few moments to about 13 or 14 knots, when the whistle was again heard, more distinctly, and in about the same direction. The master thereupon ordered full speed ahead. In about two minutes the steamer Iberia loomed into sight about two lengths ahead. The Umbria's engines were immediately reversed, and her helm ported; but she struck the Iberia, cutting her in two. *Held*, that the Umbria was guilty of reckless navigation in disregarding the rule requiring steamers to slow in a fog, and in assuming that she was clear of the Iberia's course. 40 Fed. Rep. 893, affirmed.

2. SAME.

The Iberia was approaching Sandy Hook from the eastward, drawing towards the Long Island coast on a course of W. N. W. She was capable of 9½ to 10 knots an hour, but was running about 4 knots. She heard the Umbria's whistle about two points on her port bow, and was immediately put two points to starboard, blowing a short whistle. She was kept on this course, though the whistle was heard three or four times with increasing distinctness on her port bow, until the Umbria was seen, 900 feet away, and about five points on her port hand. Her engines were then put full speed ahead to cross the Umbria's course, but she was unable to escape, and was hit at an angle of six or seven points, her stern being cut completely off. *Held* that, in view of the Umbria's apparently rapid approach on a crossing course, it was the Iberia's imperative duty to stop until she could obtain a clear understanding of the Umbria's course, and she, too, was at fault in failing to do so, and the case was one for divided damages. Shipman, J., dissenting. 40 Fed. Rep. 893, reversed.

3. SAME—DAMAGES—TOTAL LOSS—SUBSEQUENT FREIGHT.

In case of destruction of a vessel by collision the recovery is limited to her value, with interest from the time of the loss, and freight which would have been earned on the particular voyage, and there can be no recovery of net freight which would have been earned on a subsequent voyage from the port of immediate destination, and for which the vessel was already engaged. 46 Fed. Rep. 301, reversed.

4. SAME—BOUNTIES.

In case of destruction by collision, the fact that the vessel would have been able to earn a bounty under the law of her nationality is an element of value proper to be considered, but no allowance can be made for loss of bounty.

Appeal from the District Court of the United States for the Eastern District of New York.

In Admiralty. Libel by Cyprien Fabre, manager of the Compagnie Francaise de Navigation a Vapeur against the Cunard Steamship Company, Limited, to recover damages for the total destruction of the steamship Iberia in a collision with the steamship Umbria. The district court held that the Umbria alone was in fault. 40 Fed. Rep. 893. Subsequently, on exceptions to the report of the commissioner to whom the cause was referred to ascertain the damages, the court held that libelant was entitled to recover the net freight which the Iberia would have earned on a subsequent voyage for which she was already engaged, and which was to begin at New York, whither she was bound at the time of collision. 46 Fed. Rep. 801. Respondent appeals. Reversed.

Frank D. Sturges and Frederic R. Coudert, for appellant.

Robert D. Benedict, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

WALLACE, Circuit Judge. This is an appeal from a decree condemning the Umbria for the damages sustained by the Iberia in consequence of a collision which took place between the two steamships on the high sea, about six miles off Rockaway beach, Long Island, on the afternoon of November 10, 1888. There was a dense fog at the time, and had been during the forenoon, but lifting at intervals, a strong breeze blowing from about S. S. W., and a heavy swell rolling in from the same direction. The collision took place at 1:13 P. M. The Umbria was a steamship of the Cunard Line, 525 feet long, capable of a speed of 19 1-2 knots an hour, and was bound on a voyage from New York to Liverpool, carrying passengers and freight. The Iberia was a steamship, 240 feet long, capable of a speed of 9 1-2 to 10 knots an hour, and bound for New York, with freight. The Umbria, after passing Sandy Hook, and discharging her pilot, was put and kept upon a course E. by S., 3-4 S. She had been going at full speed more or less of the time, sounding her whistle at intervals of a minute or two apart. She was going at full speed from 1 o'clock P. M. until 10 minutes past 1. At 10 minutes past 1 her speed was slowed by the order of her master, awaiting the repetition of a whistle which had been faintly heard off her starboard bow, and had been reported to but not heard by him, and which afterwards proved to be the whistle of the Iberia. The whistle was heard again, this time by the master, who, assuming that it came from a steamship approaching on a course approximately parallel with that of the Umbria, and bearing three to four points from the Umbria's starboard bow, put the Umbria ahead at full speed by an order which was given at 11 minutes after 1 o'clock. While running under this order, another whistle was heard, and almost simultaneously the Iberia loomed into sight about twice the Umbria's length away, and soon was seen to be crossing the Umbria's stem. The Umbria's engines were immediately reversed, and her helm ported, but it was too late, and the collision ensued.

v.53F.no.2—19

Some of the testimony in reference to the whistles given by the Umbria's officers is as follows: The third officer, who was on the lookout bridge, testifies that he heard what he conjectured might be a whistle on the starboard bow, but he was so uncertain whether it was a whistle that he thought best not to report it; that within a minute or two he heard what he was sure was a faint whistle, bearing, as he thought, about three points from the Umbria's starboard bow, and then reported it to the main bridge; that he then heard it again, in apparently the same direction, and again reported it. The chief officer testifies that he had gone to the main bridge to see the master; that, just as he was in the act of speaking to him, the second officer, who was also on the main bridge, said a whistle was reported; that he himself heard something like a whistle, but was not sure whether it was one; that the master then gave the order to slow; that after an interval of about a minute the witness heard the whistle, and it sounded about four points on the starboard bow, and a considerable distance off, but not very plain; that the master then said, "We are well clear," and ordered the engines ahead. The second officer testifies that he heard a very faint whistle, as near as he could judge, about two points or more on the starboard bow; that after the order to slow was given, he heard it again, still faint, but more distinct than the preceding one, and more nearly ahead, and that the master then said in substance: "She is well clear of our track. Let the Umbria go full speed past her."

The Iberia was approaching Sandy Hook from the eastward, on a course drawing towards the Long Island shore of W. N. W. She had been going in the fog at a speed of about four knots an hour, and making occasional soundings. On two occasions within the half hour preceding the collision she had heard the whistle of an approaching steamer a little on her port bow, had altered her course two points to the starboard, kept on until the whistles indicated that the steamer was passed, and then returned to her former course. About a quarter of an hour after passing the last of these steamers, she heard a whistle, which proved to be that of the Umbria, bearing about two points on her port bow. Immediately, as on the previous occasions, her head was put two points more to starboard, a short whistle was blown, her helm was steadied at a course N. W., and held so until the Umbria came into view, about 900 feet away, and bearing about five points on her port hand. She then put her engines full speed ahead in the attempt to escape the Umbria by crossing in front of her, and nearly passed her, but the Umbria struck her stem on, at an angle of about six or seven points, and cut her stern completely off. After she heard the first whistle of the Umbria, and had altered her course to N. W., and while she continued on this course, before seeing the Umbria, she heard four or five whistles from the Umbria, at intervals of a minute or two between each, all bearing about four or five points on the Iberia's port hand, or, as her master says, "gaining imperceptibly on her stern, and each clearer and stronger than the preceding one."

Prudent seamanship requires a steam vessel navigating in a fog,

hearing apparently forward of her beam the fog signal of another vessel, the position of which is not ascertained, if the circumstances of the case admit, to stop her engines, and then navigate with caution, until danger of collision is over. This rule of conduct was approved by the international marine conference of 1888, as appears by article 18 of the proposed regulations. That article merely formulates the duty which nautical experience had found it necessary to observe, and which the courts had often declared obligatory. One of the more recent adjudications in which it was reiterated is Macham v. City of New York, 35 Fed. Rep. 609, in which the court, applying it to the case in hand, used the following language:

"Under such circumstances, the steamship had no right to act upon conjecture. Her duty was to reduce her speed to the lowest rate compatible with her efficient control, and proceed circumspectly, until she could locate the other vessel, and ascertain her course, or until further signals indicated that the other vessel was beyond the range of risk."

Had this duty been observed by either the Umbria or the Iberia, the present controversy would not have arisen; the collision would not have taken place. It was disregarded by both of the vessels. The master of each substituted his own judgment in place of it. The result affords a striking illustration of the propriety and necessity of obeying it.

The Iberia is less censurable for porting her helm upon hearing the Umbria's first whistle, than for persisting in her course to starboard subsequently. If it were ever permissible for a vessel to act upon conjecture, the Iberia ought not to be blamed for doing so under the particular circumstances of the situation. When so near the coast of Long Island, her master naturally assumed that the course of an approaching vessel would not bear towards the coast, and would be eastward, or eastward and southward. Hearing a whistle two points on the port bow of his own vessel, and apparently a long distance away, it is not strange that he assumed that by porting he could cross the path of another steam vessel before she would reach the point of intersection in her course and that of his own vessel; and he certainly had a right to assume that the other steam vessel would only be going at a moderate speed. If the Iberia had not been going slowly, or if, with the change of course, he had put her at a greater speed, the risk in porting would have been lessened, if not reduced to a minimum. But, after porting, the Iberia was informed by the whistles from the Umbria that the latter was rapidly approaching on a course crossing her own, and that the relative bearings of the two vessels were not changing. During an interval of probably eight minutes, the whistles of the Umbria apparently continued to bear steadily at about the same place on the Iberia's port hand. This should have made it clear to the master of the Iberia that the vessels were approaching so as to involve the risk of collision. Under such circumstances, it was his imperative duty to stop his vessel until he could come to a clear understanding of the course of the Umbria. The event proved that she would have escaped, if her engines had been put at full speed, but it could not be foretold that she could do so, and the only proper course was to ob-

serve the rule which requires steam vessels when approaching one another, so as to involve risk of collision, to slacken speed, or, if necessary, stop and reverse. It is the imperative rule, when two steamers are approaching each other in a fog, and the signals of each of them indicate that they are drawing together upon opposite or crossing courses, for each to stop until a clear understanding is reached with regard to their respective positions and courses, and, if there be any confusion of signals, or any other apparent risk of collision, not only to stop, but to reverse their engines. The law was recently stated in these terms in The North Star, 43 Fed. Rep. 807, by Judge Brown, now of the supreme court, and has been frequently so stated previously in our courts. To the same effect are the decisions of the English courts in The Beryl, 9 Prob. Div. 137; The Ceto, L. R. 14 App. Cas. 670; The Frankland and The Kestrel, L. R. 4 P. C. 529; The John McIntyre, 9 Prob. Div. 135; The Ebor, 11 Prob. Div. 25; The Resolution, 6 Asp. 363.

The facts speak so clearly in condemnation of the Umbria that it is a matter of surprise that learned and experienced counsel should insist that she was properly navigated. Her navigation was not only culpable, it was reckless. It was culpable, because, after slowing her speed momentarily to listen for the whistle which had been reported, but which he had not heard, her master acted on mere conjecture, and put the Umbria ahead without sufficient information of the course and position of the Iberia. It was reckless, because she was put ahead at full speed, and kept at full speed until the collision was inevitable. This was a flagrant violation of the law, which requires every steam vessel, when in a fog, to go at moderate speed. We do not stop to criticise her earlier conduct in running fast in a fog, which at times was so thick that vessels were not visible more than 400 feet away, along a coast crowded with vessels, bound to and from the port of New York. It suffices to condemn the Umbria that from 1 o'clock she had been running in a thick fog at full speed; that, when a vessel was heard somewhere off her starboard bow, although her speed was then reduced, so that for some time—less than a minute—she may have been going at not more than from 13 to 14 knots an hour, she was put again and kept at full speed without any information of the course, and with but little of the location, of the other steamer. Her master had not heard the faint whistle which some of the others heard, or thought they heard. The more distinct one, which he did hear, and which he thought seemed to bear four points off the Umbria's bow, was a faint one, and seemed to the other officers of the Umbria to bear anywhere from one to three points, and to one of them to be drawing ahead of her course. Her master knew, or was bound to know, that at full speed the Umbria could not be stopped within the distance at which, in the then state of the fog, she could discover another vessel so as to avoid collision. More inexcusable misconduct than characterized the navigation of the Umbria can hardly be imagined.

As the case is one where both vessels were in fault, but for which the collision would not have happened, the loss must be divided between them.

The case also involves a question of damages. The Iberia was under charter, awaiting her arrival at New York, for a voyage from New York to Cadiz; and cargo had been actually engaged for the voyage, upon which she would have earned freight, less expenses, of $3,632.32. It has been generally supposed that the owner of a vessel, in case of total loss, is entitled to a recovery of the net freight upon the particular voyage, together with the value of his vessel and interest from the time of the loss; and that interest from the date of destruction is given in lieu of the profit which might have been derived from the subsequent use of his vessel. The Amiable Nancy, 3 Wheat. 546; The Columbus, 3 W. Rob. 164; The George Bell, 3 Fed. Rep. 581; The North Star, 44 Fed. Rep. 492. None of the authorities cited in the opinion of the learned district judge hold otherwise, except the case of The Freddie L. Porter, 8 Fed. Rep. 170. The question is not free from doubt, but the weight of authority seems to be in favor of limiting the recovery to the value and the interest from the time of loss, unless there is a loss of freight which would otherwise have been earned upon the particular voyage in which the vessel is lost.

In estimating the value of the Iberia, the circumstance that she would have been able to earn a bounty allowed by the French law was an element of value, and was properly taken into consideration. No allowance was made for loss of bounty. There is no merit in the exceptions to this ruling, nor in the other exceptions which relate to the allowances of certain items of loss.

The decree of the district court is reversed, and the cause remanded, with instructions to enter a decree in conformity to this opinion, allowing the appellant the costs of this court, and dividing the costs of the district court.

SHIPMAN, Circuit Judge, dissents from the conclusions of the foregoing opinion in regard to the Iberia's contributory negligence.