### THE NYMPHAEA.

### THE MAY.

### GRAHL v. THE NYMPHAEA.

### STAG LINE, Limited, v. THE MAY.

#### (District Court, S. D. New York. October 6, 1897.)

COLLISION—FOG—LOWER BAY—REVERSAL DELAYED—NAVIGATION UNEXPLAIN-
ED—DAMAGES DIVIDED.

The steamship May, going out, and the Nymphaea, coming in from sea, came into collision a little to the northward of the swash channel in the Lower Bay in dense fog. The fog signals of each were heard by the other nearly ahead. The course ascribed by each vessel to the other was contradicted, and the navigation of each presented great difficulties, not satisfactorily explained. *Held*, that the cause of collision was the failure of each to check her speed sufficiently, or to reverse in time, and the damages were divided.

Libel and cross libel to recover damages caused by a collision between the steamships May and Nymphaea in the Lower Bay, New York Harbor.

Convers & Kirlin, for the Nymphaea.
Butler, Notman, Joline & Mynderse, for the May.

BROWN, District Judge.   The above libels were filed in behalf
of the owners of the steamships May and Nymphaea, to recover their
respective damages growing out of a collision between those vessels,
which occurred in a dense fog about 10 minutes after 10 a. m., of
September 27, 1896, in the Lower Bay, not far from black buoy No.
9, a little above the junction of the swash and main channels.

The Nymphaea had been previously at anchor in the swash channel,
near its northerly terminus, on account of the fog.   At 9:30 a. m.,
the fog having lifted, with the appearance of clearing weather, she
hove up anchor and proceeded up the swash channel on the usual
course.   When she had nearly reached the red bell buoy at the
northerly end of that channel, and on its eastern edge, the fog again
shut down thick; and that place not being a suitable place to anchor,
she continued on, intending to anchor in proper anchorage ground
to the northeastward.   She made the red bell buoy, passing from 50
to 100 feet to the westward of it, at a few minutes before 10 a. m., and
then rounded on a course of N. ½ E.   A few minutes later, on meet-
ing a white vessel outward bound, about 100 or 200 feet to the west-
ward, she changed her course to N. by E., and, as her witnesses state,
stopped her engines.   Soon after clearing the white vessel, the May's
fog whistle was heard, a little on the starboard bow, before the
Nymphaea's engines were started ahead, and her engines, it is said,
remained stopped for four minutes; and her course was continued
N. by E.   Shortly after two fog signals had been exchanged, the
May came into view, some 300 or 400 feet distant, a little on the
Nymphaea's starboard bow; whereupon the engines were reversed
full speed, but the stem of the Nymphaea struck the May's port
bow about 12 feet from the stem.   The blow carried away the stem
of the Nymphaea from starboard to port, leaving a piece of the stem
in the May's plates; and it also broke the anchor stock on the
Nymphaea's port bow and scraped her side for about 16 feet.   The
upper plates of the May along the flare were ripped up for about
40 feet from the first point of contact.   The angle of collision was
differently estimated from one-half a point to three or four points.

The May had left her dock above the bridge in the East river at
7:30 a. m. with the aid of two tugs, and got straightened on her
course, as the mate says, at about 8 a. m.   The weather was change-
able, with fog.   The vessel went a part of the time at full speed; at
other times at half speed, slow, or dead slow.   Her full speed was
about 8½ knots, that of the Nymphaea a little less.   The tide at the
time of collision was the last quarter of the flood, and did not much,
if any, exceed a knot an hour; an hour earlier it was running some-
what faster.   Her witnesses testify that during the dense fog prior
to collision, the May was going at "dead slow," i. e. about three
knots through the water; that she passed within 200 feet of the
black bell buoy at the tail of the west bank, on the west side of
the channel, and that from that point she took a course of S. by W. ¼

W., magnetic, with the design of making black buoy No. 9, a mile below, on the west side of the channel, and of going a little to the westward of that buoy; that she kept that course (S. by W. ¼ W., magnetic) for about five or ten minutes after passing the black bell buoy, when the strong fog whistle of the Nymphaea was heard a little on the port bow twice; that very soon after the second fog whistle was heard from her, the Nymphaea appeared in view, about three points on the May's port bow, whereupon her engine was reversed full speed; but collision occurred as above stated. Each vessel gave an alarm of three blasts and reversed as soon as the other was sighted, but not until then. The May's engines were not previously stopped; the Nymphaea claims that her engines were stopped for four minutes before reversal, as above stated. For each vessel it is claimed that her way through the water was fully stopped at the time of collision.

The channel way in the region of the collision is about 1,000 feet wide. The May claims that the collision was on the westerly side of the channel, and not over one-third of a mile south of the black bell buoy, i. e. about two-thirds of a mile north of the black buoy No. 9, and that the fault is wholly chargeable to the Nymphaea for being on the wrong side of the channel way, for heading some three points across the channel. and for not promptly reversing. The Nymphaea contends that the collision was close upon the easterly side of the channel, about a quarter of a mile above the red bell buoy, and as much to the southward of black bell buoy No. 9, or nearly a mile below the place of collision assigned by the May; and that the May was in fault for being on the easterly side of the channel, for immoderate speed, and for failure to stop and reverse in time.

I am unable to determine the probable place of collision with any exactness from the direct testimony. This testimony on both sides involves estimates of time and speed, which cannot be expected to be accurate. For the Nymphaea it is urged that the short interval of a little over two hours during which the May ran the distance from her pier to the place of collision, against the tide, equivalent to a little over 14 knots, proves that she must have been going much faster than her witnesses state. This interval is not compatible with the considerable time some of her witnesses say that she was running "dead slow." But these computations are close, and would not prove that she may not have been running at slow speed for the few minutes before collision. And so as against the Nymphaea, the contention that the place of collision is so clearly proved to be much more to the northward and westward than the place assigned by her, that her testimony in that regard is to be taken as evidence of fabrication, sufficient to discredit her whole testimony, does not seem to me at all warranted considering the counter testimony.

I am quite baffled by the alleged course of the May (S. by W. ¼, magnetic), testified to by her witnesses, after leaving the black bell buoy. Black buoy No. 9 is S. ¾ W., magnetic, and about one knot distant from the black bell buoy. The May, according to this, was

heading one-half a point westerly of that bearing; and as the flood tide ran due north at the rate of one knot, if the May was going only at the rate of three knots through the water, as her witnesses say, the real course of the May over the ground must have been about S. S. W., as computation will show; so that when the May got abreast of black buoy No. 9, she would have gone 1,400 feet to the westward of it, or 1,200 feet if when she made the black bell buoy she was 200 feet to the eastward of it; and if the place of collision was from one-third to one-half the distance from the black bell buoy to black buoy No. 9, as the master and pilot of the May estimate, the collision would have happened 300 or 400 feet west of the westerly side of the channel way, which is plainly untrue. I cannot find any error in this computation. So far as I can perceive, therefore, either the May was not on the course alleged by her, or her speed was so much greater than she admits as greatly to diminish the net effect of the tide, and of her course in carrying her to the westward; or else she had previously to the collision found herself on the easterly side of the channel, where the Nymphaea contends she had been, and was taking a proper course to correct her position. Whichever of these explanations may be adopted, I do not see how any superior credibility can be claimed for her story; nor any dependence placed on the supposed place of collision based on her direct evidence.

On the other hand, the evidence of certain disinterested witnesses, the pilots of the Simon Dumois, the Caribee and the Sandy Hook, makes it most probable that the collision was somewhat to the northward of black buoy No. 9. The two former vessels in coming up the main channel through the fog, overtook the Nymphaea a few moments after the collision, and while she was yet backing, though the May had gone out of sight to the westward. The Simon Dumois came near collision with the Nymphaea, and the Caribee was but little astern of her. The pilots of both of these vessels say that they overtook the Nymphaea somewhat above black buoy No. 9. Not long afterwards the steamer Sandy Hook, coming down, and a little before reaching black buoy No. 9, saw the Nymphaea to the eastward, estimated 1,000 feet off. It is suggested that the pilots of the Dumois and Caribee may have mistaken black buoy No. 9 for black buoy No. 7, a mile below. While such mistakes might possibly be made with regard to any of the buoys, as none of them are numbered, except on the map, such a mistake by these pilots does not seem probable in this instance, from the fact that they recognized the "perch and square" black buoy, which is on the westerly side of the swash channel and considerably to the north of black buoy No. 7. The testimony of these pilots also indicates, that they passed near black buoy No. 9; so that if credit can be given to the estimates of their position, the Nymphaea must have been at least as far to the westward as midchannel at the time of collision. This is a position to which the tide would in fact inevitably have brought the Nymphaea from a position a little to the westward of the red bell buoy, unless it were sufficiently counteracted by a port helm, and

it is not certain from her testimony that it was thus counteracted. When approaching that buoy she was heading N. N. W. This was at least two points to the westward of what the pilot calls the true course of the channel. When abreast of the bell buoy, the pilot says that he hauled the vessel around to N. ½ E. He immediately adds that "in the center of the (main) channel, the course is north by east a quarter east"; so that after he had hauled the ship to N. ½ E., he must still have been heading three-fourths of a point to the westward of the main channel course. His course N. ½ E., therefore, would take him three-fourths of a point across the main channel, while the tide also was operating about a point and one-fourth to carry him to the westward.

While unable, therefore, to determine precisely the place of collision, I think it probable that the collision occurred somewhat above black buoy No. 9, and not far from the middle of the channel. The place of the collision is not in itself very important, except as it may affect the confidence to be given to the precise accounts of the navigation testified to by the two vessels. If the collision was above the black buoy No. 9, it must have been about 3,000 feet above the red bell buoy; so that the interval of time after passing the latter buoy must have been greater, or her speed greater, than is to be gathered from the Nymphaea's testimony. I have in truth no doubt that the speed of both vessels was greater than either admit, both from the circumstances above stated, and from the fact that they could not stop by reversing after they were sighted by each other without a contact of considerable violence. This is shown by the wound in the May's upper works, though the angle of collision was small, and from the fact that the Nymphaea's stem was broken and carried away from starboard to port.

The one fault which it seems to me caused this collision was that the vessels did not reverse earlier, and before they came in sight of each other, when the whistles of each must have shown that they were very near. In the case of The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, referring to circumstances of very dense fog like the present, it is said: "Under such circumstances it might well be held to be the duty of each steamer to stop and reverse her engines and feel her way until the course of the other had been definitely ascertained." The rule frequently stated, that a vessel in dense fog should not proceed except at a rate of speed that would permit her to come to a dead stop after the other vessel is sighted, provided the latter is going at the moderate speed required by law, is there approved. See The Batavier, 9 Moore, P. C. 286; The Colorado, 91 U. S. 703; The Nacoochee, 137 U. S. 339, 11 Sup. Ct. 122; Steamship Co. v. Fabre, 1 U. S. App. 614, 651, 3 C. C. A. 534, and 53 Fed. 288; The North Star, 22 U. S. App. 252, 10 C. C. A. 262, and 62 Fed. 71; The Martello, 153 U. S. 71, 14 Sup. Ct. 723; The Britannic, 39 Fed. 399, and other cases there cited.

In the present case if it were clearly established that either vessel in fact came to a stop in the water before collision, she should be exonerated, and the whole blame fall upon the other. I have care-

fully considered this point upon the evidence, and I am not satisfied that such is the fact as regards either vessel. Upon this ground, therefore, each must be held to blame and the damages and costs divided.