## THE OCEANIC.

### SMITH et al. v. OCCIDENTAL & ORIENTAL STEAMSHIP CO. et al. (two cases).

(District Court, N. D. California.    April 10, 1894.)

Nos. 10,732 and 10,733.

1. COLLISION—STEAMERS—FOG—CURRENTS.

The steamship O., entering the Bay of San Francisco, about mid-channel, in a thick fog, heard, about 2½ or 3 points on her starboard bow, the fog signals of the steamer C., coming out. The bearing of the signals continued the same until the C. was seen in that direction, heading directly towards the O., and about half a mile distant. Two blasts were then blown, to indicate an intention to go to port, which was assented to, and the helm immediately put hard a-starboard. It was seen, however, that the C., instead of going to port, was moving to starboard (influenced, doubtless, by the tide rip, which she was just entering); and, after waiting about two minutes, two blasts were again given, and assented to. Almost immediately afterwards, but not until collision appeared inevitable, both ships reversed full speed. In something less than two minutes, however, the O. struck the C. on the port bow, penetrating 10 feet, and causing her to sink in a short time. The officers of the O. testified that she had been running "dead slow," which, going with the flood tide, would give, at most, 7 knots; but the court found, from the distances traversed, and especially the force of the blow, that the speed must have been over 10 knots. *Held*, on a libel for causing the death of certain passengers of the C., that the O. was in fault, for not reversing as soon as it was perceived that the C. was not answering her helm so as to go to port, and that the failure of the O.'s officers to take into consideration the influence of the tide rip, which they knew to exist, in preventing the C. from doing as she had agreed, precluded them from throwing the entire fault upon her.

2. SAME—STEAMERS CROSSING—APPLICATION OF RULE 16.

Article 16 of the rules of navigation (Act March 3, 1885), which provides that, if two ships under steam are crossing, the ship having the other on the starboard hand shall keep out of the way, applies even when the ship approaching the starboard side of the other would not actually cross, but would strike her amidships.

3. DEATH BY WRONGFUL ACT—DAMAGES—ANNUITY TABLES.

The annuity tables should not, alone, control the amount of damages, even in a state where no limit is fixed to the recovery, as in California; and the fact that many other states have fixed a limit may be considered by the court. Therefore, $10,000 are allowed in the case of a man 32 years old, in good health, and earning $1,500 a year, although the sum necessary to purchase an annuity of that amount is $24,882.

4. SAME—DEATH OF CHILD.

One thousand dollars allowed to a mother for the death of a daughter 4½ years old, in good health at the time.

These suits were commenced as actions at law to recover damages for loss of life under the California statutes (Code Civ. Proc. §§ 376, 377). The first one was brought by Henry F. Smith and George C. Smith, infants, by Eliza A. Smith, their guardian, and Eliza A. Smith for herself, and as administratrix of the estate of Henry Smith, deceased, against the Occidental & Oriental Steamship Company and the Pacific Coast Steamship Company, to recover for the death of the husband and father, Henry Smith. The second was by Eliza A. Smith, individually, against the same defendants, to recover for the death of her daughter, Myrta Smith. Afterwards, by stipula-

tion, the causes were agreed to be admiralty suits, in personam, and were transferred to the admiralty side of the court.

Clinton L. White and William H. Cobb, for libelants.

W. H. L. Barnes and Frank Shay, for respondent Occidental & Oriental Steamship Co.

MORROW, District Judge. On the morning of August 22, 1888, between 9 and 10 o'clock, a collision took place in the entrance of the Bay of San Francisco between the steamships Oceanic and City of Chester. The latter vessel was sunk and became a total loss, and several passengers on board of her lost their lives. Among those were Henry Smith and his daughter, Myrta Smith. Two actions were instituted in this court against the Occidental & Oriental Steamship Company and the Pacific Coast Steamship Company, owners, pro hac vice, of the Oceanic and City of Chester, respectively, as codefendants, to recover damages for the death of these two persons; one of the suits being brought under section 377 of the Code of Civil Procedure of the State of California by Eliza A. Smith, as administratrix of the estate of the deceased, Henry Smith, for herself, and on behalf of Henry F. and George C. Smith, infants, and children of the deceased, as their guardian, praying judgment for the sum of $75,275; the other suit being brought under section 376 of the same Code, also by Eliza A. Smith, to recover damages for the death of Myrta Smith, an infant daughter of the plaintiff, in the sum of $20,000. These actions were brought originally with a view to the plaintiffs availing themselves of such common-law remedy as this court could afford by virtue of the judiciary act; but by a stipulation entered into between the parties, and filed September 7, 1893, it was agreed that these two actions were admiralty causes, in personam, and should be treated as such. The causes were thereupon transferred from the common-law to the admiralty side of the court; all objections and exceptions to the form of such proceeding, or of any proceeding prior thereto, as not being in accordance with the admiralty rules and practice of this court, being expressly waived. It was further stipulated in open court that the two causes should be consolidated for the purposes of trial, and that separate judgments might be awarded in the cases.

On the 1st of September, 1890, the Pacific Coast Steamship Company, as charterer and lessee of the City of Chester, filed a petition in this court for a limitation of its liability under sections 4282–4289, Rev. St. U. S. Thereafter, such proceedings were had that a decree was entered, giving the Pacific Coast Steamship Company the benefit of a limitation of its liability, and fixing the extent of such liability at $75,—the appraised value of a small boat saved from the wreck of the City of Chester. In view of this fact, the libelants, on November 9, 1892, dismissed their actions as to the Pacific Coast Steamship Company, and thereupon the liability of the City of Chester was eliminated from the case; but her conduct at and prior to the catastrophe remains for the consideration of the court, in determining

whether or not the libelants are entitled to a judgment as against the Occidental & Oriental Steamship Company, the only remaining respondent.

The Oceanic is a four-masted steamer, of 3,808 tons register, with a length of 438 feet, a beam of 40¾ feet, and a draught of 25 feet. She had been engaged in making voyages between the port of San Francisco and the ports of Hong Kong and Yokohama. She was thoroughly equipped and appareled, completely officered and manned, and in every respect a stanch and seaworthy vessel. On the morning of the collision, she was entering the harbor of San Francisco, having just returned from one of her periodical trips to China and Japan. She carried, in addition to her cargo, about 1,000 passengers. She was leased by the White Star Company to the Occidental & Oriental Steamship Company. The City of Chester was a steamship leased to and operated by the Pacific Coast Steamship Company. She was used in the coasting trade, and at the time was running between this port and that of Eureka, in this state. She had a gross tonnage of about 1,100 tons, and a net tonnage of about 860 tons; was about 205 feet in length, 32 feet in beam, and 16 feet in depth. On the morning of the collision, she was just proceeding on one of her regular trips, laden with freight and passengers, and was making her way out of this port.

For the purpose of a better understanding of the testimony in the case, it may be well to notice at the outset that the collision involved four possible situations: (1) The collision may have been the result of inevitable accident, in which event the respondent would not be held liable for the consequences. (2) The City of Chester may have been wholly at fault, and the Oceanic blameless, and the respondent therefore not liable. (3) The City of Chester may have been blameless, and the Oceanic at fault, and the respondent therefore liable. (4) Both the City of Chester and Oceanic may have been at fault, and the respondent, therefore, liable. Ward v. The Ogdensburgh, 5 McLean, 622, Fed. Cas. No. 17,158.

The first situation is not pleaded as a defense, or relied upon, by the respondent. It remains, therefore, for the libelants to establish either the third or fourth situation. The respondent claims that the proofs show that the collision took place notwithstanding the Oceanic endeavored, by every means in its power, with due care and caution, and a proper display of nautical skill, to prevent the disaster. Reducing the controversy to its simplest terms, for the present purpose, it may be stated, briefly, that the libelants claim that both the City of Chester and Oceanic were at fault, as indicated in the fourth situation; and the respondent contends that it is excused because the Oceanic was not at fault, as indicated in the second situation.

The collision took place between half-past 9 and a quarter of 10 on the morning of August 22, 1888, at the inner entrance to San Francisco bay, known as "Golden Gate Channel." It occurred at some point between Fort Point and the land opposite, known as "Lime Point." The precise locality, owing to the fog then prevailing, and the conflicting testimony on that point, is somewhat in-

volved in doubt, and can only be determined approximately. For a better understanding of the locality, and the movements of the two vessels, reference may be had to the accompanying map:

The width of the channel, where the collision took place, is stated to be about seven-eighths of a nautical mile, or, by chart measurement, about 5,200 feet. It is the narrowest point in the channel, and the whole body of water is navigable almost from shore to shore. The sea, on that morning, was calm. The tide was flood. The pilot on the Oceanic fixes low water at 6:15 in the morning. Ferdinand Westdahl, of the coast and geodetic survey, fixes low water, by the tide tables, a little earlier,—at 5:53. The difference is immaterial. At the time of the collision the flood tide had been running in for about three hours and a half, or nearly four hours. The testimony shows that in entering the channel the young flood tide makes in along the south shore, striking the land just outside of Fort Point, and from there deflects, and sheers off across the channel, nearly due north, towards Lime Point, until it reaches about

mid-channel,—sometimes beyond it, depending upon, the force of the current,—where it resumes the same course as the true tide, coming in mid-channel. The evidence shows that there is a tide rip of considerable force from Fort Point to mid-channel, deflecting the courses of vessels entering it, and making it necessary that in crossing the current, outward, they should starboard their helms, to make the rip and preserve their courses.

The testimony presents an irreconcilable conflict as to the place of collision. The evidence introduced by the libelants in relation to the outward course of the City of Chester along the south shore of the bay, the distance and bearings of objects on the shore, and the location and effect of the crossing tidal current near Fort Point, would fix the place of collision at a point considerably south of mid-channel. On the other hand, the evidence introduced by the respondent in relation to the inward course of the Oceanic along the north shore to the entrance of the harbor, and the distance and bearings of points on shore, would fix the place of collision some distance north of mid-channel. These two points would be about 3,000 feet apart. It is manifest, therefore, that, if these two vessels were pursuing the courses indicated by the testimony relating to each, a collision was impossible; but a collision did occur, and, for the purpose of understanding the movements of the two vessels at and prior to the collision, it becomes necessary to determine as nearly as possible the place of its occurrence.

The course claimed by the pilot and captain of the Oceanic is, briefly, as follows: The Oceanic had arrived off the entrance to San Francisco bay early on the morning of August 22, 1888. She made for the whistling buoy, where the pilot grounds are situate, near which she took up the pilot, Louis Myer, about 8 o'clock. The pilot steered the vessel in for the whistling buoy, which was picked up and passed on the north side, according to the testimony of the pilot, about 1½ miles off, and, according to that of the captain, about a half a mile away. It was there that the course of the Oceanic was first shaped northeast by east for the entrance. The weather, as stated above, was foggy; densely so at times, and less so at others. The sea was calm. The pilot and captain consulted together as to the advisability of entering the harbor under the conditions then prevailing. They deemed it safe to make the attempt, taking adequate precautions, in proceeding at a very slow rate of speed, blowing the fog whistle, and keeping a sharp lookout. About midway between the whistling buoy and Point Bonita, they passed the ship Lord Wolseley, which was lying at anchor somewhat north of mid-channel. A tug had just come up, and was preparing to tow her in. The pilot states that he "steered a little towards her," and asked the master of the tow boat the kind of weather there was inside, but the answer, on account of the distance between them, could not be understood. The master of the tug fixes the distance at which the Oceanic hailed him as, approximately, a quarter of a mile. Proceeding on, Point Bonita, or, as it is sometimes called, North Head, was passed about a half a mile off. According to the testimony of the pilot and captain, its form was just perceptible to the naked

eye, although Tillston, the first officer, who was on the lookout, states that he did not see it. At this point the engines were put "dead slow," which meant a speed of about four knots an hour,— just enough to give her steerage way. At the same time the course of the vessel which hitherto had been N. E. by E., was altered one-half a point to the N., making it N. E. ½ E. Point Bonita, as testified by Pilot Myer, was made about 9:19 o'clock. It was then that the two orders just referred to were given,—one to the engineer, to go "dead slow," and the other to the wheel, to port half a point. Point Diablo was passed eight minutes later, as fixed by the pilot. The same rate of speed, "dead slow," was maintained all this time. Point Diablo could be more plainly discerned than Point Bonita. The witnesses state that it was all the way from a quarter to a half a mile. It was between these two points—in the neighborhood of Point Bonita—that the pilot and officers of the Oceanic first detected the fog whistle of an outcoming steamer. The direction from which the sound of the whistles proceeded indicated that the approaching vessel was some three points on their starboard bow; that she was on the inside of the harbor, and had not reached the channel; and, furthermore, that her course with relation to that of the Oceanic did not seem to change materially. After passing Point Diablo, as the fog signals of the approaching vessel grew more pronounced, a sharp lookout was kept off the starboard bow. Presently, the captain of the Oceanic discovered the dark mass of a hull looming up in the fog, about 2½ to 3 points on his starboard bow. Tillston, the first officer, who was stationed at the bow, on the lookout, had also discovered the presence of the vessel, which proved to be the City of Chester, and had communicated that fact to the bridge. The first officer fixes the distance between the two vessels when he first discovered the City of Chester as between 600 to 800 yards (1,800 to 2,400 feet); the pilot, at about a half a mile; the captain, at about a half a mile. Bridgett, the second officer, who was on the bridge, estimates the distance as, also, about half a mile. Swan, the third officer, who was at the helm, places the distance when he first saw her at, also, about a half a mile. The position of the City of Chester with reference to the Oceanic was 2½ to 3 points on the starboard bow of the latter, the former vessel's bow pointing directly amidships of the Oceanic. Capt. Metcalfe testifies: "She was heading right for us, straight; all masts and funnel in line. If anything, we could see probably a little more on the starboard bow." "I should say she was on our starboard bow. She was end on to us. We were never at any time end on to her." "She was so nearly end on that you might call it end on." "Heading right for our bridge, apparently." Immediately upon seeing the form of the City of Chester emerging through the fog, the order was given by the pilot to blow two whistles, indicating that the Oceanic would go to the left. At the same time the helm was put hard a-starboard. Tillston heard the order given. Bridgett did, also. Capt. Metcalfe testifies that the helm was put hard a-starboard at the same time that the first signal was given, and he says further, "The ship, not having much way on her, turned gradually and slowly to port."

·Again, he says: "The ship was going at very slow speed, and naturally she took a long time to move. She did move to the left, but how much I cannot say,—not sufficient to endanger the ship going onto the shore." The question being asked, "Is that a factor in it,—the fact of her going dead slow?" he answered: "She would take very much longer to do it. That is all. Q. But not any more water? A. I don't know that she would. It is only an assumption on my part. As I have told you, we never experimented." He says further: "The helm having been starboarded, the ship altered her course probably a point or a point and a half to the north." The City of Chester answered these two whistles of the Oceanic almost immediately after. She blew two whistles, as indicating that she acquiesced in the proposed maneuver, and would do the same. But it appears, as we will discover later on, that the City of Chester had not yet caught sight of the Oceanic, nor did she do so until a collision was unavoidable. The Oceanic, as stated above, answered her helm but slowly. The course of the City of Chester did not seem to change to the left to any appreciable degree, as it should have done. On the contrary, as the vessels approached she seemed to swing to the right. She was watched closely by the pilot and captain of the Oceanic. A short time expired, fixed at about two minutes by the witnesses, during which the vessels were approaching each other all the time; and it was observed by those on the Oceanic that the City of Chester was going gradually to the right, instead of to the left. In view of this fact, the pilot gave a second order to blow two whistles, which was immediately acknowledged by the City of Chester with two, also. The pilot and captain of the Oceanic finding that, after the second signal had been assented to by the City of Chester, she still failed to respond to her starboard helm, and to alter her course, as she had promised to do, gave the order to go full speed astern. Then the collision was a foregone conclusion. The engines went full speed astern for a very brief time,—about 2 or 2½ minutes,—overcoming in some degree the forward speed of the Oceanic, which was about four knots, exclusive of the flood tide, when that vessel crashed into the City of Chester, on the latter's port side, some 20 feet abaft her bow; penetrating to a distance of about 10 feet, or about one-half the beam. The engines of both vessels were stopped, and the Oceanic was kept impaled in the breach she had made in the City of Chester, so as to keep the latter vessel, which was filling fast with water, afloat. The boats of the Oceanic were immediately lowered, and every effort was made by the officers and crew of the Oceanic to save life. Both vessels, while thus impaled, drifted with the tide towards the inside of the entrance. They drifted for some five or six minutes, when, finding that the City of Chester could no longer be kept afloat, the Oceanic backed a little, and the City of Chester sank.

The course and maneuvers of the City of Chester, as testified to by her captain, officers, and passengers, were substantially as follows: She left Broadway wharf about 9 o'clock on one of her periodical

trips to Eureka, and was put under full speed, which was about 10 knots. On account of the fog which prevailed to the north, Capt. Wallace followed rather closely the south shore of the bay, passing, as he says, about 150 feet on the inside of Presidio Shoal buoy. About here he commenced to enter the fog,—hitherto he had been running on the edge of it,—and, as the vessel penetrated further, "it got very thick." He states that he ran into the fog about half-way between the Presidio Shoal buoy and the Fort. He testifies that he steered the usual course to clear the Fort. Upon entering, or just after having entered, the thick fog, the steamer was slowed down to half speed. Either before, or almost immediately after, this order had been communicated to the engineer in charge, two whistles of an approaching steamer were heard off the starboard bow. The captain responded with two, signifying that he would go to port, thus acceding to the proposed maneuver. The helm of the City of Chester was then placed hard a-starboard, to conform to the signal. At this time he had not seen anything of the Oceanic, but he had heard her fog signals for some time previously. In fact, he did not obtain sight of the Oceanic until after the second signal had been answered by him. He testifies that a good lookout was being kept. Lundine, the second officer, was on the lookout, and supplements the captain's testimony that the Oceanic was not seen until after the second signal to go to port had been answered by the City of Chester. The time is approximated at less than a minute after the second signal. The reason assigned by the captain for not seeing the Oceanic before was the thickness of the fog: "It was so foggy we couldn't see her." After the first interchange of signals, the City of Chester proceeded a little further on, her speed not being checked, when the captain heard the approaching vessel blow two more whistles,—a repetition of the signal to go to port. He answered these, also, with two, indicating his assent. Almost immediately after, certainly less than a minute, as fixed by the captain, he caught sight, for the first time, of the Oceanic. She loomed up out of the fog 1½ or 2 points now on his port bow. He immediately saw that a collision was inevitable, and rang the indicator, full speed astern, and let the flood tide take her bow, her stern being still in the eddy, and let her swing right around. In less than two minutes from the order to go full speed astern, the Oceanic ran into the City of Chester, on the latter's port side, about 20 feet from her bow, penetrating a distance of about 10 feet, as before stated. As soon as the concussion took place, the engines were stopped. The vessel filled rapidly, and, after drifting for some five or six minutes, sank at some distance from the place of collision.

It will be noticed that these two sets of narratives agree substantially with each other as to what took place at, and just previous to, the collision. In fact, on most points, excepting, notably, the place of collision, they are corroborative of each other. There is no conflict as to which vessel first became apprised of the other's presence,—that the Oceanic first sighted the City of Chester, while the latter did not see the former until after the second signal had been exchanged, and the collision was inevitable. There is no real

conflict as to the relative positions of each vessel when they first became aware of each other's proximity,—that the City of Chester was on the Oceanic's starboard bow from 2½ to 3 points. There is no contradiction as to the signals exchanged, and the measures adopted by both in pursuance of such signals,—that the Oceanic, having first caught sight of the City of Chester, with that vessel on her starboard bow, took the initiative, and elected to starboard her helm, and go to port; that she gave the required signal, of two whistles, to communicate such election, which was assented to by the City of Chester with two whistles; that both vessels thereupon placed their helms hard a-starboard; that the Oceanic answered her helm but slowly, while the City of Chester did not respond to hers at all, but, on the contrary, went to starboard instead of to port; that the Oceanic, perceiving that the City of Chester did not take the course agreed upon, gave a second signal, of two whistles, to go to port, which the City of Chester likewise answered with two whistles, indicating that she would do so; that almost immediately after the second signal the City of Chester, for the first time, caught sight of the Oceanic, and that then that vessel was 1½ or 2 points on the former's port bow; that then, both seeing that a collision was inevitable, went full speed astern for 1½ or 2 minutes; that the effect of full speed astern with the helm hard a-starboard was to throw the bows of both vessels to the right, particularly the City of Chester, which had the flood tide against her port bow; that when the order to reverse was given the City of Chester was either in the tide rip, or was just entering it; that the vessels came together nearly at right angles, the City of Chester heading northerly, and the Oceanic easterly; that the Oceanic ran into the City of Chester on the port bow of the latter, some 20 feet abaft the port bow, and penetrated about 10 feet, or about one-half of the beam of that vessel; that both vessels, thus impaled, drifted towards the inside of the entrance, with the flood tide, for about 5 or 6 minutes, when the City of Chester could no longer be kept afloat, and sank. About all these facts there is no dispute. What may seem apparent contradictions are readily explained. But, as before stated, there is an irreconcilable conflict as to the place of collision. The respondent claims that the collision took place nearer to the north than to the south shore, and fixes the distance as about a quarter of a mile from Lime Point, in a southerly direction, while the captain, officers, and passengers of the City of Chester fix the collision as having occurred near Fort Point,—the point opposite Lime Point,—the captain estimating that the collision took place from 600 to 650 feet from Fort Point, nearly due north from that point about one-eighth of a mile. The courses pursued by both vessels anterior to the collision would be important factors in determining the locality of the collision. But the testimony on this point, instead of assisting the court, only involves the question with more perplexity; for, according to the testimony of the pilot and officers of the Oceanic, the course pursued, or intended to be followed, by this vessel in entering the harbor, would have been along the north shore of the channel, and would bring the vessel to the

point of collision as fixed by them, viz. about one-quarter of a mile from Lime Point; while, on the other hand, according to the testimony of the captain of the City of Chester, the latter vessel hugged the south shore on account of the fog. The captain of the City of Chester states that he steered the usual course to clear Fort Point, and fixes the place of collision, as above stated, at about 600 to 650 feet off Fort Point,—north, or nearly so. Had both vessels pursued, up to the time of the collision, the course said to have been followed by each, they would certainly have cleared each other by at least a half a mile. But the fact remains that a collision did take place, and it is certain that either or both accounts of the courses steered, with reference to the place of collision, must be incorrect.

The pilot, captain, and officers of the Oceanic testify to a course steered by that vessel, tracing it from the time when the pilot headed the vessel N. E. by E. for the entrance until the time of the collision, the object of which is to show that they brought the vessel in north of mid-channel, and that their line of progress, as delineated on the map introduced by counsel for respondent, is directly in line with the place of collision as fixed by them. They seek to do this by describing a course pursued by the Oceanic from the whistling buoy, and by estimating the distances at which that vessel was when off to the northward of the whistling buoy, and the distances at which Points Bonita and Diablo were passed. This method of ascertaining the place of collision would be of value, if the distances were accurately estimated. The difficulty is that the witnesses themselves do not agree as to the distance of the Oceanic from the whistling buoy when her course was first shaped for the entrance, nor do they agree as to the distances at which Point Bonita and Point Diablo were passed. Pilot Myer testifies that, when he first shaped the course of the Oceanic N. E. by E. for the entrance, he was about $1\frac{1}{2}$ miles northeast of the whistling buoy, while Capt. Metcalfe fixes the same distance as about a half a mile. Both witnesses had equal powers of observation, so far as the evidence shows. Making due allowance for the fact that both estimates were approximations, under somewhat difficult conditions in view of the prevailing fog, yet the discrepancy is not reconcilable. The same infirmity exists as to the estimates of the distance at which the witnesses claim that they passed Points Bonita and Diablo. The pilot and Capt. Metcalfe swear that Point Bonita was passed about one-half of a mile off; that they could just see the loom of it through the fog; while Tillston, the first officer, who was on the lookout, states that he did not see Point Bonita. As to the distance at which one could see, he testifies: "Before we got to Point Bonita, I should say we could see fully a quarter of a mile, as we passed a big sailing ship lying at anchor. As we got inside from Point Bonita, it cleared away, and I imagine I could see half a mile; and so it continued up to the time of collision." It was on passing this point that the course of the Oceanic was altered one-half a point to the north, and the pilot says, "With that course, we made Point Diablo very plain,—not more than from $\frac{1}{4}$ to $\frac{1}{2}$ a mile." Capt. Metcalfe says they could see Point Diablo pretty well. On the other hand, First Officer Tillston, who was all this time

on the lookout, says he could just see the loom of Point Diablo, and, being asked to fix the distance, says, "I should imagine, from the state of the fog, that it would be one-quarter of a mile." These inconsistencies do not commend to the court the accuracy of the course claimed by counsel for respondent as the true one, and as going to show that the collision must have occurred where they claim it did, viz. about one-quarter of a mile south from the north shore, or Lime Point. This contention is not only flatly contradicted by Capt. Wallace, and opposed to the testimony of the officers and passengers on board the City of Chester, who agree in fixing the place of collision as at some point near Fort Point, and certainly south of mid-channel, but, by the testimony of the pilot of the Oceanic, himself, it is very questionable whether the collision occurred as far north of mid-channel as the testimony of Capt. Metcalfe and of the second officer, Bridgett, would have it. He (the pilot) testifies as follows:

"Q. As near as you understand the position of the Oceanic, you were north of mid-channel? A. Yes, sir. Q. This is the position that you put the Oceanic in at the time of the collision? A. Yes, sir. Q. About how far would that place be, where the collision occurred, from mid-channel? A. It must have been very near. Q. Very near mid-channel? A. She must have been very near mid-channel. Q. Then you were coming in very near mid-channel? A. No, sir; the Chester. I was on the north side. Q. We will agree on this: That the Oceanic was here when the collision occurred (pointing). A. Yes, sir. Q. Now, I want to know how far this point of collision is from mid-channel? A. Pretty close."

The witness subsequently states that they were a quarter of a mile from the north shore. But this testimony is plainly inconsistent with the statements cited above. It is to be observed, further, that Capt. Metcalfe testifies that when he first sighted the City of Chester she was about one-half a mile off, and the Oceanic was then about one-quarter of a mile from Lime point. He was asked how it was that, having his helm hard a-starboard, he avoided running into the north shore, when he was only a quarter of a mile away from it, and the City of Chester was a half a mile distant; and he answered by saying that the Oceanic was going at a very slow rate of speed, and naturally took a long time to move. She did move to the left, but how much he could not say,—not sufficient to endanger the ship going onto the shore. This reply is susceptible of one of two constructions: Either he was much further towards mid-channel, or to the Fort Point side of mid-channel, than he himself was willing to admit, or else the Oceanic was so slow in answering her helm as to be unwieldy. The captain says that he could see the white fog signal on Lime Point landing plainly, and Second Officer Bridgett fixes Lime Point, when the collision took place, at less than one-fourth of a mile away. But, on the other hand, Capt. Wallace, of the City of Chester, is equally positive in his statements, and estimates the distance of the collision from Fort Point at 600 to 650 feet nearly north of that place. He testifies as follows:

"Q. How far off from the south shore did this collision occur? From Fort Point, do you mean? Q. Yes, from Fort Point,—from the south shore. A.

Well, there is 150 feet off the buoy. Probably, about from 600 to 650 feet off Fort Point. Q. In what direction? A. North; nearly north. Q. Had you, or hadn't you, passed the buoy? A. No, sir; we hadn't passed the buoy."

Subsequently Capt. Wallace states that, although the fog was very thick around Fort Point, he saw this buoy just when the Oceanic loomed up. He states that it was 100 or 150 feet on his port bow.

The other witnesses who testify that the collision took place south of mid-channel, or near Fort Point, do not pretend to fix, with any degree of accuracy, the place of collision. The passengers who testified,—those who are disinterested, as well as those who might be supposed to have an interest, in the result of the case, agree that it was south of mid-channel, but exactly where does not appear. Furthermore, it is to be observed that their estimates of distances are subject to the same objection pointed out in commenting on the testimony of the pilot, captain, and officers of the Oceanic. They are all approximations, given under the difficult conditions attending observations in a thick, drifting fog.

Charles McCullom, the first officer of the City of Chester, testified that it was clear until they got opposite to the Presidio; that then he went below. On hearing two whistles, and those followed by two more, he came up on deck, and then the Oceanic was about 50 feet away. As to the place of collision, the witness says that when he came up he could not see land on either side. He guesses that both of the vessels were nearer Fort Point than Lime Point.

John Lundine, the second officer of the City of Chester, who was stationed at the bow of this vessel, states that upon hearing the whistles, which was some few minutes previous to the collision, they were not quite up to Fort Point, but pretty close to it. He does not know the position of the City of Chester exactly. He says that he didn't notice how far from the south shore they were. He could see the south shore, but whether he saw it directly south, he does not say. But he testifies that if they had gone along their old course they would have been within a ship's length of the buoy. This witness does not seem to have taken particular notice of the place of collision.

Rufus Comstock, the second engineer, states that the first land he noticed after getting into one of the Oceanic's small boats was Fort Point. As to the distance, he says:

"I didn't notice exactly, but I know that we were not very far. I shouldn't think it could have been a quarter of a mile. I don't think it was over a quarter of a mile. I know that we were pretty close into Fort Point buoy—must have been—at the time of the collision."

This fact he noticed about five or six minutes after the collision.

James Rankin, the keeper of the Fort Point lighthouse, at the time of the collision, was about 200 feet from the extreme point of the Fort; 200 feet due south; up on the high ground; on the bluff. He states that he did not see the collision (he could not, on account of the fog), but gives his impression as to the respective courses of each vessel by means of the whistles; first, their fog signals, and then their double whistles to go to port. From the sound of these, he judged that they were coming

close to Fort Point, and, apprehensive that something serious would result, he paid close attention. He says he heard the crash. The weather, at the time of the collision, was very thick. He could not see the flagstaff on the fort,—not even the fort itself. He does not pretend to be able to fix exactly, or at all, except in a general way, the place of collision. He testifies: "I would judge, drawing a line from Fort Point to Lime Point, it to be one-third of the distance across, and about one-quarter of that distance towards the city."

Clitus Barbour, a passenger on board of the City of Chester, says that he could not tell exactly where the collision occurred, but he thinks they were nearly off Fort Point. He says they drifted some distance down the harbor in a small boat. He refers to the fact that in passing the Presidio he could see the buildings, wharf, etc., and says that, if there was any fog, it was out beyond. As to the relative distances between the two shores, where the City of Chester went down after having drifted for five or six minutes, he says, "My own notion was— It is somewhat confused in my mind, but it appeared to me further to the Saucelito shore than it was to this shore."

The effect of the flood tide appears to have some bearing in determining the place of collision. The tide rip near Fort Point is caused by the cross current of the flood tide. That the City of Chester was in this tide rip, or was just entering it, is almost certain. This is attested by two facts: First, the fact that that vessel failed to answer her starboard helm, and went to starboard, instead of to port. The testimony shows that the tide was running at about a five-knot speed at this point, and that it sets so strongly across the entrance towards mid-channel that vessels, in order to make the rip, starboard their helms. In other words, the natural sheer of the tide would be to carry a vessel to the right, or towards mid-channel. Capt. Metcalfe thus states the influence which the flood tide has on vessels about to cross it in that locality: "If her helm had been starboarded then, which is usually done by every steamer going out of the port on flood tide, in order to make that rip, she would have recovered herself very quickly, and gone on about her business." Therefore, the fact that the City of Chester failed to respond to her starboard helm, in view of the positive testimony of her captain that he placed her helm hard a-starboard, and kept it there, from the very first signal, is accounted for or explained by the force and action of this tide rip upon vessels crossing it. Again, the rapidity with which the City of Chester was turned to the right when her engines were placed full speed astern is also explained by the action of the tide rip. The very fact that the vessels collided almost at right angles,—the Oceanic running into the port side of the City of Chester, some 20 feet abaft her bow,—when, some two minutes before the collision, the Oceanic had the City of Chester on her starboard bow, indicates that the force of the current must have been an efficient cause in thus radically changing the positions of the vessels. The additional fact that the

Oceanic, in going full speed astern with her helm hard a-starboard, the result of which combination would be to send her to the right, while the fact was that she did not turn very much in that direction, as compared with the turn which the City of Chester made, action on the part of the Oceanic attributable to the force of the current she had to contend against, indicating that she was also in or near the tide rip or cross current.

Considerable stress is laid by both sides upon the testimony of T. P. H. Whitelaw, called for the respondent, and F. Westdahl, called for the libelants, as both of these witnesses undertake to fix exactly the place where the wreck of the Chester was found. T. P. H. Whitelaw, engaged in the business of wrecking, testifies that on the day of the collision he went to ascertain where the Chester lay. He states that he found where she was by oil coming up to the surface of the water, and made a mental note of the bearings of the wreck. Some two years after, he went out, accompanied by Bridgett, the second officer of the Oceanic, to ascertain again the position of the wreck. He says that the only bearings he had to go by were those which his memory afforded him from his investigations on the day of the collision. Using these, he states that he struck the wreck at the first sounding. She was then situated about three-fifths of the distance towards Lime point, somewhat towards the inside of the harbor; that is, two-fifths of the distance from the north shore and three-fifths from the south shore, or Fort point.

Ferdinand Westdahl, a master mariner connected with the United States coast and geodetic survey, made investigations to ascertain the position of the wreck. He experimented by drifting with a tug on a flood tide, to fix upon the approximate place of the wreck. He made three drifts, starting approximately from where Capt. Wallace fixed the place of collision. Each drift brought him close to mid-channel, and considerably inside of the harbor. With this data, he searched for the wreck. He says:

"We swept along the bottom with a line weighted with great bars and window weights until we finally caught on to what we supposed was the City of Chester,—the wreck of her. I determined where she was then, or what we supposed was the City of Chester,—where it lies."

He located the wreck very nearly in mid-channel, while Whitelaw fixes the location of the wreck further to the north, but not quite so far inward. Respondent claims that Whitelaw's location must be correct, because it is more in the line of progress of the course of the Oceanic up to the time of the collision than that of Westdahl. It is not denied that the Oceanic and City of Chester, while impaled, drifted for some distance inward, on the flood tide, in the short space of five or six minutes. There were several forces which undoubtedly operated to finally deposit the wreck of the City of Chester at a point to the northward and eastward of the place of the collision. The City of Chester was, at the time of the collision, going nearly straight across the channel, and the Oceanic was coming in on a course N. E. $\frac{1}{2}$ E., with her helm hard a-starboard. The point of collision was at the bow of the Oceanic, and near the bow,

and on the port side, of the City of Chester. The force of the collision was such that the bow of the Oceanic cut into the City of Chester about 10 feet, or about halfway through the vessel. This propelling force was therefore inward and northward. The flood tide off Fort Point sheers across the entrance towards mid-channel, and then flows inward on nearly a straight course. This force was first northward, and then inward. In view of these conditions, we should expect to find the wreck of the City of Chester to the north and inward of the place of collision, and hence it is that we infer that the collision took place near mid-channel; but, since we cannot hope to fix the place of collision with absolute certainty, it does not seem necessary to determine which of these two wrecks shall now be considered the remains of the City of Chester.

After a careful examination of all the evidence, aided by the inferences arising out of the natural probabilities attending the situation, I have reached the conclusion that the collision took place somewhere near mid-channel, but nearer Fort Point than Lime Point. This determination necessarily places the inward course of the Oceanic a little to the south of that delineated on the chart or map introduced by the respondent; but it is a course that accounts for the collision in accordance with what appears to me to be the established facts in the case, and particularly the actions of the two vessels.

The point of collision having been established as nearly as possible, we proceed now to consider the conduct of the two vessels, and the law of the road applicable to their movements. Section 2360 of the Political Code of this state provides the following rule of navigation:

"When steamers meet each must turn to the right, so as to pass without interference.".

Section 970 of the Civil Code provides as follows:

"(1) Whenever any ship, whether a steamer or sailing ship, proceeding in one direction, meets another ship, whether a steamer or sailing ship, proceeding in another direction, so that if both ships were to continue their respective courses they would pass so near as to involve risk of collision, the helms of both ships must be put to port so as to pass on the port side of each other. (2) * * * (3) A steamer navigating a narrow channel must, whenever it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of the steamer. (4) A steamer when passing another steamer in such channel, must always leave the other upon the larboard side. (5) When steamers must inevitably or necessarily cross so near that, by continuing their respective courses, there would be a risk of collision, each vessel must put her helm to port, so as always to pass on the larboard side of each other."

Both vessels elected to violate these rules, and attempted to pass each other starboard to starboard, and a collision was the result. As the Oceanic was the first to depart from the rules, she took the risk of passing in safety; and, failing in the movement, the law holds her in fault. The Columbia, 29 Fed. 716; The Rockaway, 38 Fed. 856, affirmed 43 Fed. 544; The Garden City, 38 Fed. 860; The Titan, 44 Fed. 510, affirmed 49 Fed. 479, 1 C. C. A. 324; The Clara, 49 Fed. 768. But the argument of counsel having been directed more particu-

larly to the rules provided in the act of congress of March 3, 1885, prescribing "Revised International Rules and Regulations for Preventing Collisions at Sea," we will proceed to consider the movements of the vessels with respect to these rules. Article 16 of these rules provides as follows:

"If two ships under steam are crossing so as to involve risk of collision, the ship which has the other on her own starboard side shall keep out of the way of the other."

## Article 18 provides:

"Every steamship, when approaching another ship so as to involve risk of collision shall slacken her speed, or stop and reverse, if necessary."

## Article 19 provides:

"In taking any course authorized or required by these regulations, a steamship under way may indicate that course to any other ship which she has in sight by the following signals on her steam-whistle, namely: One short blast to mean 'I am directing my course to starboard.' Two short blasts to mean 'I am directing my course to port.' Three short blasts to mean 'I am going full speed astern.' The use of these signals is optional, but if they are used the course of the ship must be in accordance with the signal made."

## Article 21 provides:

"In narrow channels every steamship shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such ship."

## Article 22 provides:

"Where by the above rules one of two ships is to keep out of the way, the other shall keep her course."

## Article 23 provides:

"In obeying and construing these rules due regard shall be had to all dangers of navigation, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

When the Oceanic discovered the City of Chester coming out of the harbor, the former had the latter on her starboard bow; and under article 16 the Oceanic was bound to adopt such a course as would enable her to keep out of the way of the City of Chester, while the latter was entitled to keep her course. The Oceanic had ample opportunities to "keep out of the way" of the approaching City of Chester, had she acted in due season. There were no impediments to any maneuvers she might have seen fit to make, if these had been carried out at the proper time. The testimony shows that the whistles—the fog blasts—of the City of Chester, when first heard, indicated that she was some three points off the starboard bow of the Oceanic. As the vessels approached, the repeated fog blasts from the City of Chester confirmed that vessel's position and bearing with respect to that of the Oceanic, and, furthermore, indicated that the City of Chester seemed to maintain about the same course, and continued to head in the direction of a point amidships of the Oceanic. Such is the testimony of the pilot, captain, and officers of the Oceanic; and it is an undisputed fact that when the City of Chester was first sighted her position with relation to the Oceanic

was exactly what these witnesses, guided solely by the sound of the fog blasts of the City of Chester, had determined it to be, viz. 2¼ to 3 points off the Oceanic's starboard bow, heading for amidships. The signals were first heard off Point Bonita, perhaps shortly after that point had been passed. They continued to be heard, increasing in distinctness as the vessels approached each other. These fog signals from the City of Chester were timely notice to the Oceanic to be on guard against the danger of a collision. The situation certainly called for the utmost caution; and while it may be said that the Oceanic, proceeding "dead slow," was not required, under the circumstances, to do anything more until the City of Chester should come into view, and her course ascertained, nevertheless the Oceanic should have been prepared by these warnings for immediate action as soon as the dangerous proximity of the City of Chester had been discovered. But was the Oceanic proceeding dead slow? Pilot Myer says they were abeam of Point Bonita at 9:19, when the order to go dead slow was given. Eight minutes later, he says, they were a quarter of a mile off Point Diablo. These two points are about 1½ miles apart. To traverse this distance in 8 minutes requires a speed of more than 10 knots an hour, and yet the pilot tells us that, in going dead slow, he was making 3 to 4 knots through the water without regard to the effect of the tide, and that the tide was running 2 or 3 knots. The greatest possible speed, he admits, is therefore not more than 7 knots over the ground. That the Oceanic was proceeding at a higher rate of speed than this is confirmed by the testimony of Allen, the chief engineer of the Oceanic. He says that at 9:14 they were going dead slow, and 11 minutes later they went full speed astern. Capt. Metcalfe testifies that when the City of Chester was sighted by the Oceanic the latter vessel was about a quarter of a mile from Lime Point, —probably then to the southwest of that point; but, from other testimony, it appears that it was not until the vessel was directly off Lime Point that the order was given to go full speed astern. The distance between Point Bonita and Lime Point is more than 2 miles. To traverse this distance in 11 minutes would require a speed of more than 13 knots an hour. But allowing for possible errors in bearings, and reducing the distance to 2 miles from Point Bonita to the place where the order was given to go full speed astern, and we still have a speed of more than 10¾ knots per hour. Had this vessel been going over the ground at the rate of 7 knots per hour,—her highest possible speed at that time, according to the pilot,—she would have required 12 minutes to pass from a point directly abeam of Point Bonita to a point directly abeam of Point Diablo, and more than 17 minutes to pass from Point Bonita to the place where the order was given to go full speed astern. It is plain, therefore, that either the Oceanic was going at a higher rate of speed than has been admitted by her officers, or the interval of time between the orders to go dead slow and to reverse was greater than that stated by the witnesses. The Oceanic was, in my opinion, proceeding along the

mid-channel, aided by its strong current. That she was going at a higher rate of speed than dead slow is established by the fact that, although she reversed a few minutes before the collision, she drove her bow into the City of Chester some 10 feet, or about one-half the latter's beam. That this force was not all the effect of the flood tide is proven by the fact that both vessels were practically in the same current, and the City of Chester was also acting under an order of reverse.

Article 13 of the act of March 3, 1885, providing: Revised International Rules and Regulations for Preventing Collisions at Sea,"—is as follows: "Every ship, whether a sailing-ship or a steamship, shall in a fog, mist, or falling snow go at a moderate speed." In the case of The Normandie, 43 Fed. 156, Judge Brown, of the southern district of New York, says that:

"What is 'moderate speed' is largely a question of circumstances, having reference to the density of the fog; the place of navigation; the probable presence of other vessels likely to be met; the state of the weather, as affecting the ability to hear the fog signals of other vessels at a reasonable distance; the full speed of the ship herself, her appliances for rapid maneuvering, and the amount of steam-power kept in reserve, as affecting her ability to stop quickly after hearing fog signals."

A great many cases have been before the courts, involving the question of what is a moderate speed for a vessel in a fog; but it will not be necessary to review these cases, since, for the present purpose, the rule applicable to the situation under consideration may be briefly stated in the words of Judge Wallace in the case of Fabre v. Steamship Co. (decided in the circuit court of appeals for the second circuit) 3 C. C. A. 534, 53 Fed. 290. He says:

"Prudent seamanship requires a steam vessel navigating in a fog, hearing, apparently forward of her beam, the fog signal of another vessel, the position of which is not ascertained, if the circumstances of the case admit, to stop her engines, and then navigate with caution until danger of collision is over."

This rule, as Judge Wallace states, had been incorporated into the "Regulations for Preventing Collisions at Sea" adopted by the international marine conference of 1889, where it appears as article 16; but it is found there because nautical experience had determined that it was necessary to observe such a rule, and the courts have often declared it obligatory. In the case of The City of New York, 147 U. S. 84, 13 Sup. Ct. 211, the supreme court said:

"There is no such certainty of the exact position of a horn blown in a fog as will justify a steamer in speculating upon the probability of avoiding it by a change of the helm, without taking the additional precaution of stopping until its location is definitely ascertained."

Applying this rule to the present case, we find that the Oceanic, being warned by fog signals, apparently forward of her beam, that another vessel was approaching through the channel, instead of keeping on in the direction of danger, should have stopped her engines, and then navigated with caution until the danger of collision was over. The claim that is made that she reduced her speed to dead slow off Point Bonita, when the fog signals were first heard, did not meet the requirement of the situation, even if her speed was

only at the rate of 7 knots per hour; but, if we conclude that she was steaming and drifting in the tide at the rate of 10 knots per hour,. then, clearly, she was proceeding in gross violation of the rule, and must be held responsible for the consequences.

The question now is, was the Oceanic, having an unknown vessel on her starboard side, required to act on the fog signals of the latter, and keep out of her way, as provided in article 16 of the rules and regulations of 1885, or was the Oceanic at liberty to go on until the approaching vessel should come into view, and then regulate her conduct in accordance with the situation as it should then appear? Would the mere fact that fog prevented the officers of the Oceanic from getting sight of the City of Chester sooner excuse or relieve them from acting upon the signal of danger which her fog blasts indicated? To admit that they were justified in pursuing such a course would, in my judgment, avoid this important rule of navigation, and remove one of the most effective safeguards against collision in foggy weather. This examination into the conduct of the Oceanic with respect to the fog signals of the City of Chester has not been made, however, for the purpose of determining whether she was at fault during this stage of her progress. It has been rather for the purpose of better understanding her later movements, which are the subject of controversy .

We come now to consider the conduct of the Oceanic after the City of Chester came into view. The latter vessel was discovered looming up through the fog about a half a mile distant on the starboard bow of the Oceanic, precisely as the fog signals had previously indicated. It was certainly then the duty of the Oceanic to adopt prompt measures to keep out of the way of the City of Chester. The Aurania, 29 Fed. 124; The Ogemaw, 32 Fed. 922. What did she do? She signaled to the City of Chester, with two blasts of the whistle, that she would direct her course to port, and for the City of Chester to do the same, and accordingly the helm of the Oceanic was put hard a-starboard. The City of Chester responded to the signals of the Oceanic with two blasts of her whistle, indicating that she would direct her course to port; that is to say, she would pass on the starboard side of the Oceanic. It was, however, soon discovered that the City of Chester was not carrying out the agreement, but, on the contrary, was acting as though under the influence of a port helm, and was directing her course to starboard. Two minutes after the first signal, the Oceanic gave the second signal of two blasts; adhering to her previous determination to direct her course to port, and indicating that the City of Chester should do the same. The City of Chester answered as before, but kept on the contrary course. Almost immediately after, the order was given on the Oceanic to go full speed astern; but this order came too late, for in two minutes the vessels were in collision.

Counsel for respondent claim that the rule which requires that a vessel which has another on her starboard side shall keep out of the way of the other does not apply in this case, because the steamers, as is claimed, were not on crossing courses. The contention is based upon the ground that if the line of the course of the Oceanic had been

produced, when that vessel first caught sight of the City of Chester, it would never have touched the City of Chester, while, if the line of the course of the City of Chester had been produced, it would have crossed the Oceanic somewhere about the funnel or bridge. These, they claim, do not constitute crossing courses. It is admitted that the vessels were not end on to each other, and they were not on parallel courses, but they were approaching each other from opposite directions, obliquely. The City of Chester was so headed, and both vessels were so advancing and approaching each other, that, unless they changed their courses radically, the bow of the City of Chester would eventually strike the Oceanic amidships. This was the very thing which the rule was designed to prevent. If this was not a crossing course by one vessel, involving a risk of collision, it is difficult to understand how the course could be designated, or what rule of navigation could apply. If their contention be true, then, as the vessels were confessedly not end on, nor on crossing courses, none of the rules would be applicable. But I think there can be no question that the vessels were on crossing courses, within the meaning of article 16. The language used is very broad, and apparently refers to any crossing of courses involving risk of collision. The very fact that it does not specify any particular course or courses indicates, to my mind, the general character of the rule. One vessel may be crossing the path of another, or both may be approaching on converging lines, so as to meet at a given point, or, as in the case at bar, one may so bear upon another that eventually, if no change is made in the course of one or both, a collision is rendered imminent. In any of the above instances the risk of collision, all things being equal, is as great in the one case as in the other. The vessels, in my opinion, were on crossing courses, within the meaning of the rule; and the Oceanic, having the City of Chester on her starboard bow, and being apprised of that fact, or chargeable with notice of that fact, from the direction of the repeated fog signals, for some 10 or 12 minutes before the collision, should have kept out of the way, and should have taken steps to do so much sooner than she did. The Lepanto, 1 C. C. A. 503, 50 Fed. 234; The Georgia, 1 C. C. A. 489, 50 Fed. 129.

We have now reached the important question in the case: Was the Oceanic at fault in failing to reverse sooner than she did? The testimony indicates that when the first signal was given, and answered by the City of Chester, the helm of the Oceanic was put hard a-starboard. There is, however, a discrepancy in the testimony of Pilot Myer on this point. He first says that the helm was put hard a-starboard at this time, and again his statements would seem to indicate that the helm was not put hard a-starboard until the second signal was given; but the captain and officers agree that the helm was placed hard a-starboard immediately after the first signal. This order, it will be remembered, was given as soon as the City of Chester had been discovered through the fog. The distance at which the City of Chester was first seen was about half a mile. Although this vessel answered the two whistles of the Oceanic with two, thus agreeing to go to port, yet she did not, at any time before the collision, act in accordance with her signal. All the wit-

nesses on the Oceanic agree that the City of Chester failed absolutely to comply with her promise. Upon answering the first signal, she seemed to respond to her starboard helm just a trifle; but this was only momentary, for she seemed to be under the influence of a port helm,—going to the right, instead of to the left. Her course to the right was not a sudden or radical change from left to right, but it was a steady and gradual change, becoming more apparent all the time, until, when under full speed astern, with her helm hard a-starboard, she went to starboard so rapidly that she got across the bows of the Oceanic, that vessel running into her on her port side some 20 feet abaft the bow. But at no time, the witnesses on the Oceanic all swear, did the City of Chester appreciably answer her starboard helm, by going to the left, as she had agreed to do. This fact was observed by the pilot, captain, and officers; and yet no steps were taken by either the pilot or the captain to ascertain whether the signal had been misunderstood, or incorrectly answered. Fully two minutes were allowed to pass by, the vessels meanwhile continuing to approach each other, when the pilot, becoming alarmed at the aspect affairs were assuming, ordered two more whistles,—to go to port,—which the City of Chester answered also with two. About half a minute or thereabouts expired after this second signal had been given and answered, when, for the first time, the order to reverse was given by the captain of the Oceanic. It appears that it was about this time that the City of Chester first obtained a view of the Oceanic; and her captain, seeing that a collision was absolutely unavoidable, also gave the order of full speed astern. Both sides agree—that is, the witnesses on the Oceanic and the City of Chester concur—that, when the order to reverse was given by each, the collision was inevitable. It is plain that this order came too late to be of any utility, even to materially mitigate the disastrous effects of the collision, for the City of Chester was penetrated by the Oceanic fully 10 feet, or about half her beam, and could only be kept afloat by keeping the Oceanic impinged in the breach, and even then she was kept afloat for only five or six minutes. In this the Oceanic was clearly at fault. She should have gone full speed astern much sooner, particularly in view of the warning conveyed to her in the fog signals of the City of Chester. In my judgment the Oceanic should have been reversed the instant it was discovered that the City of Chester did not respond to her helm as she had agreed to. The situation was a critical one at that time, and called for immediate action, as further developments conclusively showed. It was absolutely necessary to reverse then, to avoid, not a mere risk of collision, but a collision itself. The risk of collision, to my mind, existed for some time prior. It was certainly present when they first sighted the City of Chester. The very object of the maneuver which the pilot of the Oceanic elected to adopt, and acceded to by the City of Chester, was made with the view of avoiding a collision. The pilot says:

"I said: 'Now, it is time to give him two distinct whistles, to tell him we will starboard; he is now on our starboard bow; he is going this way,—so that he may put his wheel starboard, and clear us.'"

The testimony of this witness as to when the danger of collision arose is significant:

"Q. Do you mean to tell us that there was but one thing that would have saved the ship from colliding with you, after you first saw her, and that was that she should go to starboard; that she should obey her starboard helm? A. Certainly. Q. That was the only thing that would prevent a collision, from the time you first saw her? A. Yes, sir. Q. Then, from the time you first caught sight of the Chester, you felt that there would be a collision unless she went to port? A. Yes, sir. Q. Unless she obeyed her starboard helm? A. Yes, sir. Q. Is that right? A. Yes, sir. Q. If that is the condition of affairs, why did you sound the second signal? A. Because she did not go that way. Q. You sounded the second signal to get her to go that way? A. Yes, sir."

Again:

"Q. As I understand, you say, when you saw the City of Chester a half a mile away, and some three points on her starboard bow, that nothing could avert the collision or disaster except her turning to starboard. A. That is what it is."

This testimony is substantiated by that of Capt. Metcalfe, and the other officers of the Oceanic.

Now, if it was necessary, when the City of Chester came into view, for both vessels to act, in order to clear each other, it is too plain to need comment that there was a serious risk of collision. That being true, the instant that the officers of the Oceanic saw that the City of Chester did not do as she ought to have done, with all the means at their command, their skill and experience, and in view of the significant symptoms of danger already adverted to, they should certainly have stopped and reversed. The language of Judge Simonton in delivering the opinion of the circuit court of appeals for the fourth circuit in the case of The Louise, 3 C. C. A. 330, 52 Fed. 885, is applicable to the case at bar. He says:

"These [the rules of navigation] leave but little room for mere conjecture in controlling the action of the master and pilot. Each of them has in his power the means of ascertaining with approximate certainty the intention and course of an approaching steamer. He must use them. Notwithstanding this, errors committed by one of two vessels approaching each other from opposite directions do not excuse the other from adopting every proper precaution required by the special circumstances of the case to prevent a collision. Rule 24; The Maria Martin, 12 Wall. 47; The Scotia, 14 Wall. 181. If there be any uncertainty as to the intentions of the approaching vessel, this, of itself, calls for the closest watch, and the highest degree of diligence, on the part of the other vessel, with reference to her movements; and it behooves those in charge to be prompt in availing themselves of every resource to avoid, not only a collision, but the risk of such a catastrophe. The Manitoba, 122 U. S. 108, 7 Sup. Ct. 1158."

In The America, 92 U. S. 432, Mr. Justice Clifford, speaking for the supreme court, said:

"Sailing rules were ordained to prevent collisions between ships employed in navigation, and to preserve life and property embarked in that perilous pursuit, and not to enable those whose duty it is to adopt, if possible, the necessary precautions to avoid such a disaster, to determine how little they can do in that direction without becoming responsible for its consequences, in case it occurs."

Again:

"Rules of navigation are ordained to preserve life and property, and not to promote or authorize collision. Even flagrant fault committed by one of two

vessels approaching each other from opposite directions will not excuse the other from adopting every precaution to prevent a collision. The Maria Martin, 12 Wall. 47."

The case of The Khedive (decided by the house of lords in 1880), 5 App. Cas. 876, is in point. The facts of that case were not as strong against the vessel failing to reverse in a seasonable time as in the case at bar. There the collision had been precipitated by another vessel—the Voorwaarts—suddenly altering her course. The master of the Khedive, thus taken unawares, gave the order to place the helm hard a-starboard, and for the engineers to stand by the engines, ready for any emergency. About a minute and a half later, he gave the order "Full speed astern." But, after an elaborate consideration of the case, the house of lords held that he gave the order to reverse too late; that he should have done so when he directed the engineers to stand by their engines; that the rule of navigation that "every steamship, when approaching another ship, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse"— which is the same as our rule (article 18 of the act of March 3, 1885) —gave the master no discretion when risk of collision was present; that he was bound to stop and reverse at the first moment of danger; and that, as he had not done so, the Khedive was in part to blame. Lord Blackburn observes:

"We are advised, and are of opinion, that under the circumstances, and in the position of those two ships, it was quite right that the helm of the Khedive should be put hard a-starboard. But then comes the question whether the captain ought not, at the time he gave the order to put the helm hard a-starboard, to have ordered the engines to be stopped and reversed. It was obvious that at that moment there were two steamships approaching each other in great danger of collision. It is obvious, therefore, that the rule of navigation applied, unless there were something which made it necessary, for the safety of the navigation, that the rule as to stopping and reversing should not be acted upon."

Speaking of the conduct of the master of the Khedive, he says:

"He at once took in the situation, and was aware that there was risk of collision, and that it was imminent, if not inevitable; and he acted with great promptitude and skill, so as greatly to alleviate the violence of that inevitable condition. But he did not stop and reverse, nor even slacken his speed; and there he departed from the course prescribed by regulation 16. Nor was there anything in the circumstances rendering a departure from this rule necessary, in order to avoid immediate danger. Even if it would, in the absence of such a positive rule, be better seamanship to keep way on the ship, in order to make her more manageable (which is not clear), the legislature has thought it better to prescribe the course which must be followed."

In the case at bar, fully $2\frac{1}{2}$ minutes, at least, were allowed to pass by, after the dangerous proximity of the City of Chester had been discovered, before the order to reverse was given, and then the risk of collision cannot be said to have been an imminent one. It was a foregone conclusion. The order to reverse was delayed in the face of the fact that, during all this time, it was seen that the City of Chester was not answering her helm, and was not going to port, but, on the contrary, was going to starboard. The City of Chester was not, in fact, executing the maneuver relied on to avoid a collision. This was observed from the first. The pilot and captain of the Oceanic should therefore have appreciated the imminent risk of collision the instant

they saw that the City of Chester did not respond to her helm, and should have acted promptly. They neither stopped, nor did they reverse. They now seek to justify their tardy action upon the ground that, as the master of the City of Chester had signaled that he would go to port, they were justified in relying upon that signal, and this in the face of, and with positive and convincing evidence of, facts which showed that the City of Chester was not doing as she had agreed to do, but was doing just the opposite. If they did not observe these facts, they should have done so, and their failure to do so cannot be excused.

In the case of The Beryl (decided by the court of appeals) 9 Prob. Div. 137 (1884) Brett, M. R., held that although the Beryl had the right of way, and had slackened her speed from a quarter to a half a mile distant from the Abcona, and had stopped and reversed some 300 yards distant, she was still in fault, for failing to reverse soon enough, and she was held mutually liable with the Abcona. The learned judge observed:

"I am sorry, in this case, to have to come to the conclusion to which I feel bound to come. I take it that the basis of the regulations for preventing collisions at sea is that they are instructions to those in charge of ships, as to their conduct; and the legislature has not thought it enough to say, 'We will give you rules which shall prevent a collision.' They have gone further, and said that, 'For the safety of navigation, we will give you rules which shall prevent risk of collision. It is not enough if you do only that which will apparently prevent a collision. We will give you rules which shall regulate your conduct, not merely for the purpose of preventing even a risk of collision.' * * * Another rule of interpretation of these regulations is (the object of them being to avoid risk of collision) that they are all applicable at a time when the risk of collision can be avoided,—not that they are applicable when the risk of collision is already fixed and determined. We have always said that the right moment of time to be considered is that which exists at the moment before the risk of collision is constituted. The words are not, 'If two ships under steam are crossing with a risk of collision,' but 'are crossing so as to involve risk of collision;' that is, the moment before there was a risk of collision."

And again he observes:

"That rule [to slacken speed, or to stop and reverse], in my opinion, like all the others, applies particularly to the moment before the risk of collision is constituted and exists. It is at a time when the action of both steamers is such as to involve risk of collision. At that moment of time, if what they are doing involves a risk of collision, they are both to slacken their speed. It applies to each of them. But it may be that the condition of things just before the moment when the risk of collision is to be constituted is such that slackening will not avoid that risk of collision, and that it requires another maneuver, namely, that of stopping and reversing, and then they must stop and reverse, either one of the other, or both. That, again, is an instruction as to the conduct of men, and it cannot be that they are to do that thing merely because it is proved afterwards that there was a risk of collision, or if there was risk of collision about to be constituted. It must apply if the circumstances are such that an officer of ordinary skill and care would be bound to come to the conclusion that if the ships continue to approach each other there will be risk of collision."

The case of Fabre v. Steamship Co., supra, involved the question of responsibility for a collision between the steamship Umbria and Iberia near the entrance to New York harbor. The district court held that the Umbria, alone, was in fault. The circuit court of ap-

peals found that both vessels were to blame, and, in commenting on the conduct of the Iberia, said:

"During the interval of probably eight minutes, the whistles of the Umbria apparently continued to bear steadily at about the same place, on the Iberia's port hand. This should have made it clear to the master of the Iberia that the vessels were approaching, so as to involve the risk of collision. Under such circumstances, it was his imperative duty to stop his vessel until he could come to a clear understanding of the course of the Umbria. The event proved that she would have escaped, if her engines had been put at full speed; but it could not be foretold that she could do so, and the only proper course was to observe the rule which requires steam vessels, when approaching one another, so as to involve risk of collision, to slacken speed, or, if necessary, stop and reverse. It is the imperative rule, when two steamers are approaching each other in a fog, and the signals of each of them indicate that they are drawing together upon opposite or crossing courses, for each to stop until a clear understanding is reached with regard to their respective positions and courses; and, if there be any confusion of signals, or any other apparent risk of collision, not only to stop, but to reverse their engines."

The court cites a number of cases in support of this doctrine; among others, that of The Beryl, supra. There are also many other cases to the same effect; and while it may appear that the situations in these several cases differ in some particulars from the one at bar, nevertheless the rule of safety, as declared by the courts, is applicable here, and determines that the Oceanic, under the circumstances of her situation, was at fault, in not stopping and reversing her engines in time to prevent the collision. In this connection, the conduct of the captain and pilot with respect to the probable effect of the tidal current upon the City of Chester should not be overlooked. They both admit that they did not take into consideration the probable effect which the tide rip or cross current, which they knew the City of Chester had to cross, would have on her starboard helm. They claim that this was a matter solely for the captain of the City of Chester to have taken into consideration when he assented to their signal to go to port. They claim, further, that they did not know, as a matter of fact, the position of the City of Chester with respect to the tide rip. But they admit that they knew where the tide rip was, and they admit that they knew the position of the City of Chester, for they had sight of her when she was a half a mile off,—so they claim,—and kept her in view continuously up to the collision. Putting all this information together, it could not have been such a difficult task to determine—approximately, of course—the fact whether or not the City of Chester had or had not crossed the tide rip. But they confess that they did not give "the matter of the Chester being caught in that tide any consideration whatever." And yet the captain admits that a vessel going from slack water into a cross current would be carried off her course, to some extent, and that such was the effect of this tide rip upon vessels crossing it, going out of the harbor; and he also states it as his opinion that, when he first caught sight of the City of Chester, she had not yet crossed that rip. He says:

"Assuming the position of the Chester to be half a mile from me, on my starboard bow, when the first signal was given, she was not within the influence of that tide rip, in the neighborhood of Fort point."

He therefore knew, or should have known, that the City of Chester had to cross that current, and yet he confesses that he gave the matter no consideration whatever; in other words, he ignored this factor completely, and the order to go to port was given by the pilot, and insisted on, regardless of the probable effect of the flood tide on the helm of the City of Chester.

In the case of The John H. May, 52 Fed. 882, Judge Butler said:

"He [the captain] says that he was unaware of the state of the tide, which tended to carry the barge upward. This was inexcusable ignorance, for which, also, his vessel must answer."

In the case of The Ogemaw, 32 Fed. 919, the same doctrine is affirmed:

"A steamer bound to keep out of the way must, at her own peril, shape her course for a safe margin against the contingencies of navigation and the effect of tide currents."

In view of these established rules of navigation, the conclusion is reached that the Oceanic was at fault in her movements, and, failing to use ordinary care in attempting to pass the City of Chester, she is mutually responsible with the City of Chester for the damages resulting from the collision.

As to the amount of damages: The deceased, Henry Smith, was 32 years of age, and in first-class health. He had been married for some five years and a half, and was the father of three children, one of whom, Myrta Smith, also lost her life in the disaster. He had been engaged, just previous to his death, in the dairy business, in Sacramento, Cal. His widow testifies that he owned some property in connection with the dairy business, 160 acres of land, about 45 cows, 10 or 15 head of horses and mules; that he supported himself and family, including his father and sister-in law; that the family expenses were from $75 to $100 per month, and that he made from $50 to $75 over that sum a month. His yearly earnings would therefore, at that rate, amount to from $1,500 to $2,100. He had $500 on his person when drowned, which was missing when his body was found. Testimony was introduced to show that, to purchase an annuity of $1,500, on a male person 32 years of age, and in good health, would require $24,882 in cash. There are, however, considerations involved in determining the value of a life not embraced within the rules of the annuity tables. Morgan v. Southern Pac. Co., 95 Cal. 521, 30 Pac. 601; Cheatham v. Red River Line, 56 Fed. 248; In re Humboldt Lumber Manuf'rs' Ass'n, 60 Fed. 428. In 14 states, these considerations have found expression in statutes limiting the amount that may be recovered for the death of a person to $5,000, and in two states and one territory the law limits the amount to $10,000. There is no limitation in this state. Section 377 of the Code of Civil Procedure provides that "such damages may be given as under all the circumstances of the case may be just." The statutes of those states which fix a limit have been noticed by the courts in other states, and have had weight in fixing the amount of damages. In view of all the circumstances of this case, I will assess the damages caused by the death of Henry Smith at $10,000.

Myrta Smith was over 4½ years of age, and in good health. The supreme court of this state, in Morgan v. Southern Pac. Co., 95 Cal. 510, 30 Pac. 603, held that in an action by a parent to recover damages for the death of a minor child, caused by negligence, the main element of damage is the probable value of the services of the deceased during minority. Manifestly, there is no rule that will enable the court to estimate, with any degree of accuracy, the probable value of the services of a child. But as the statute gives the right of action for the benefit of the parent, without regard to circumstances, I must determine that there is some injury, which I fix in the sum of $1,000.