## Case No. 9,639.

### The MINNIE R. CHILDS.

### The R. P. NOBLE.

[9 Ben. 200.] [1]

District Court, E. D. New York. July, 1877.

COLLISION—STEAMBOAT AND VESSEL—SPEED.

1. Where a tug coming into the channel of the Kill von Kull, above Staten Island, with a schooner in tow, met a steamboat coming from Newark Bay, and exchanged signals with her, but a collision ensued between the steamboat and the tow: *Held*, that the steamboat was in fault, for not getting to the east side of the channel, after exchanging signals with the tug showing that the latter was to go on the west side.

2. The tug was not in fault for keeping up her speed under the circumstances, nor the schooner in fault for not failing to cast off the hawser.

3. A steamboat that cannot be steered should be stopped.

[Cited in The City of Macon, 47 Fed. 925.]

In admiralty.

L. A. Lockwood, for the libellants.
Beebe, Wilcox & Hobbs, for the tug.

1 [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

1 [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

H. B. Whitbeck, for the steamboat.

BENEDICT, District Judge. This action is brought to recover for damages done to the schooner Gillan, by being run into by the steamboat Minnie R. Childs, on August 1st, 1874, in the Kills. The schooner was being towed by the tug-boat R. P. Noble, upon a hawser some eighty feet in length, and was bound towards New York. The Minnie R. Childs was bound in the opposite direction, on a trip from Newark to Coney Island. The time of the collision was about 10 o'clock in the morning. The weather was clear, the tide flood, and there were no other vessels to interfere with the navigation. The place of the collision was between the stake-light and the lower end of the middle ground in the channel that runs from opposite Elizabethport, and between the middle ground and the Staten Island shore, where there was abundant room for vessels like these to pass in safety. The libellant charges fault upon both the steamboats. Each steamboat charges the other with being the sole cause of the collision, and the Minnie R. Childs charges fault upon the schooner.

Upon an examination of the voluminous testimony taken in the case, I deem it entirely clear that no fault can be imputed to the schooner. The fault suggested (which, by the way, is not made to appear in any pleading), is that she omitted to cast off the tow hawser when it was seen that the Minnie R. Childs was likely to strike her. But that manoeuvre would have been of doubtful propriety, to be thought of only at the last moment, and the failure to adopt it in the extremity is not a fault. It seems also to be apparent that there was no fault in the management of the tug. She turned the point of the middle ground as close as she could do with safety, and from that time until the collision, was bearing as strongly as she could for the west side of the channel, which extends about a half a mile from the point of the middle ground to the stake-light. She blew two whistles to indicate her intention to take the west side, as soon as the Minnie R. Childs appeared at the stake-light, which whistle was replied to by two whistles of the Childs, and the evidence is that those whistles were in accordance with the universal custom of boats passing up that channel on flood tide. I see nothing improper in the movements of the tug. The weight of evidence is that it is usual for boats going up in such trips to take the west side. The testimony is that any other course would have been dangerous, and it is conceded that her choice of the west side was acquiesced in by the Childs at once, for she answered by two whistles the two whistles of the tug. It is true the tug kept up her speed until the moment of the collision, but that was the only effort she could make to avoid the collision, and it was calculated to accomplish the end. From the time of exchanging signals until the accident, the Noble

kept to starboard as much as possible, and she was close to the west side of the channel when the vessels struck.

The pilot of the Childs says he was close on the bar himself, not more than twenty-five yards from it, at the collision. It seems clear then that the collision must be attributed to the fault of the Childs, in that she did not keep further to east and so as to pass the tow to west in accordance with the signals that had been exchanged. The pilot of the Childs testifies that he saw the tug when she began to turn the lower part of the middle ground and at once gave one whistle; that the tug answered immediately with two whistles to which he replied with two whistles. This testimony shows conclusively that the Childs acquiesced in the course chosen, that she expected to take the east side and that the tow would take the west side. But for some reason the Childs failed to get over to the east side as is shown by the positions of the vessels at the collision. Under the circumstances it was the duty of the Childs to get over to the east side, so as to pass in safety, or if she could not do that to stop and allow the tow to pass her to port, as it would have done if the Childs had stopped before coming up to the tow. The pilot of the Childs says that he did not ring to stop until the Noble was just lapping the bow of the Childs.

It was suggested in the argument that the Childs in such shallow muddy water would not steer well, and that this is the reason for the failure to get over to east. If such be the fact it does not avail to relieve the Childs from responsibility for damage caused thereby. If she could not be steered she should have been stopped. There must be a decree in favor of the libellant against the Childs, and the libel as against the Noble must be dismissed with costs. Let a reference be had to ascertain the amount of the damage.