THE LAKME. THE TYEE. THE QUEEN ELIZABETH.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1902.)

No. 819.

1. COLLISION—STEAM VESSELS MEETING—VIOLATION OF RULES.

A tug proceeding up Puget Sound with a large ship in tow on a line 600 feet long, having on her starboard, and within a mile, a shore toward which the tide was setting, and along which there were shoals, was not guilty of a violation of the navigation rules in signaling her intention of passing a meeting steamer starboard to starboard where the shore on that side was 4 or 5 miles distant, and where the signal was given and assented to when the approaching steamer was a mile distant, coming nearly head on. In such case there was no danger of collision if both vessels promptly complied with the signals agreed on, and the course of the tug was justified by the greater safety to her tow, and did not cast upon her the burden of proof to avoid liability for a following collision between the steamer and the tow.

2. SAME—FAILURE TO COMPLY WITH AGREEMENT FOR PASSING.

Evidence considered on which a steamer was *held* solely in fault for a collision with a meeting ship, in tow of a tug, on the ground that she proceeded under a port helm after assenting to a signal from the tug to pass starboard to starboard, until immediately before the collision, although there was ample room for her to go to port, and both the tug and her tow at once changed their course in compliance with the signal.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

In Admiralty. See 113 Fed. 772.

This is a case of collision. The undisputed facts are few. The Queen Elizabeth, a large sailing vessel, with ballast, was lying at Port Townsend, desiring to be towed to Port Blakely. In pursuance of a towage contract, the tug Tyee, owned by the appellee the Puget Sound Tugboat Company, took her in tow at Port Townsend between 1 and 2 o'clock on the morning of April 14, 1900. She was made fast to the Tyee with a hawser 100 fathoms in length. The Tyee rounded Point No Point at 3 o'clock and 31 minutes on the morning of April 14th, and thereupon changed her course to south southeast by the pilot-house compass. This course carried her nearly parallel with the adjacent western shore between Point No Point and Apple Cove Point. The collision occurred south of Point No Point lighthouse a few minutes after the Tyee and the Queen Elizabeth had passed that point. The speed of the Lakme was 7½ miles per hour, and the Tyee with her tow was making between 8 and 9 miles per hour. The vessels were seen approaching each other by the officers in charge of both the Tyee and the Lakme when they were distant from each other 3 or 4 miles. The Lakme was in charge of her second mate; her captain and the first mate being

¶ 2. Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

asleep until the masthead lights of the Tyee were seen, when the captain was called and told that they were near Point No Point. He was not informed that the other vessels were seen ahead, and he did not come out on the bridge until it was too late to avoid the collision. The second mate of the Lakme did not have a license or certificate entitling him to be employed as an officer of the steam vessel, either as master, pilot, or mate, and there was not at that time any licensed pilot on duty. The Lakme carried all the lights required. There is some controversy as to whether some of the lights were properly arranged. The tug, up to and at the time of the collision, was in command of a duly licensed and competent pilot, and was properly officered and equipped. The lights of the tug and her tow were properly placed and burning, as required by law in such cases. The Queen Elizabeth, during the same period, was in command of her captain, and had a lookout on deck, beside the man at the wheel. The tide was ebbing for a short time prior to the collision, and a strong current set in toward the western shore between Point No Point and Apple Cove Point. The original libel was brought by the Queen Elizabeth against the Lakme to recover damages for injuries received in the collision. The tug was not made a party to the libel, and the Lakme brought a cross-libel against the tug Tyee to recover the damages it sustained. These causes were consolidated, tried, heard, and disposed of together. It is admitted that the Queen Elizabeth was entirely free from fault. Upon the hearing the district court found that the Lakme was alone at fault: (1) For being under way without being in charge of a licensed pilot; (2) for approaching Point No Point from the southward, in the way of vessels going in the opposite direction, without any necessity or reason for being so far over toward the west shore; (3) for steering an irregular course after the lights of the Tyee and her tow had come into view ahead of her; (4) for porting her helm when she was distant from the Tyee one mile or less, without having previously given the proper signals indicating her purpose to change her course to starboard; (5) for being too slow in putting her helm hard astarboard, after answering and assenting to the signal of the Tyee indicating that the steamers were to pass each other starboard to starboard; (6) for not stopping and reversing her engines promptly when the danger of a collision became apparent. A decree was entered (113 Fed. 772) in favor of the Queen Elizabeth and against the Lakme for $4,500, from which decree this appeal is taken. The conflict in the testimony relates to the course and direction in which the vessels were moving; how far they were apart when the signals were exchanged between the Tyee and the Lakme; how far distant the Tyee was from the western shore. Did the Lakme at any time exhibit its green light to the Tyee? Were there any shoals near the western shore; if so, at what points? To fully understand the conflict in the testimony it is deemed best to quote largely from the record, and, inasmuch as several of the witnesses testified upon different points, it is, perhaps, best to arrange their testimony covering all the points, instead of separating it upon each point involved and grouping them under the name of the vessel in whose employ they were at the time of the collision.

On behalf of appellant, the Lakme, Captain Schage, the master of the Lakme, testified as follows: "Q. Did you notice how far out in the sound from the west shore, how far you were from the Point No Point light shore? A. * * * We were nearer the west shore than the east shore. The sound is about five miles and a half or six miles across, something like that, and of course we were about two miles probably from the west shore; either a mile and a half or two miles from the west shore. Q. Were there any shoals or obstructions of any kind that you know of between you and Point No Point shore at that time? A. None."

F. Guilfoyle, the acting second mate of the Lakme, testified as follows: "Q. What was the first that you saw of the tug Tyee and its tow, the Queen Elizabeth? A. The first I saw was her masthead light coming around the point. Q. About how far off was she at that time? A. She must have been three or four miles off. I could not judge exactly the distance. * * * Q. What was the position of the Lakme at that time with reference to being inshore or out towards the middle of the sound? A. We were coming down

the middle of the channel, and the tug Tyee, with her tow, was coming round Point No Point, and the first that I saw was her masthead lights. I kept them in view all the time. Q. What other lights did you see? A. I did not see her starboard light until she crossed our bow. Q. What was the first light that you saw after she came in full view; I mean, with her side lights? A. I saw her red light. Q. After you had seen her red light, in what position was that with reference to the bow of your vessel, whether dead ahead or one side or the other? A. It would probably be about two points when I first saw her. Q. Two points where? A. On our port bow. * * * Q. Did you leave the bridge at any time after you first saw the Tyee? A. Yes, sir; I did. Q. About what time was it with reference to the time that you first saw her? A. After I sighted the lights * * * I went down and called the captain. * * * Q. How long were you gone? A. I could not have been gone more than about two or three seconds. * * * Q. What happened after that with reference to signaling? A. There was no signaling at all. He was coming on our port bow. I had my hand up to pull the whistle when he blew two, and of course I answered him with two. I said 'Hard astarboard.' The man at the wheel put the wheel hard astarboard. Q. How long was that after you got back on the bridge and had called the captain before those signals were passed? A. It must have been between three and five minutes. * * * I was there walking up and down the bridge, I should judge for about five minutes, before the captain came up. Q. And during that five minutes, what was the course of the two vessels? A. We were going about west half north, I should judge, or west quarter north. I would not be sure. * * * We were right in the center of the stream. We were just coming a midway course down the sound." Upon cross-examination: "Q. When the tug blew two whistles, could you make out whether she was swinging on her starboard helm or not? A. No, sir; she was coming straight on. When she blew her two whistles, then she swung on her starboard helm. * * * Q. How far were you apart when you first ported your helm? A. We must have been probably a mile. Q. Then you changed from west half north to what course? A. To west by south, just to give myself a little more sea room. * * * Q. With a port helm, and then the tug and the Lakme were about a mile apart when you ported your helm? A. Yes, sir. * * * Q. When you ported your helm, did she swing off slowly to starboard? A. No, sir; she was just swinging off. * * * Q. When you got the two whistles, she was just swinging off? A. No, sir. When I ported my helm, I just had my hand up to pull the whistle, and he pulled two. Q. Just as you ported your helm? A. Yes, sir. Q. And you had your hand up? A. I had my hand up to blow one, to let him know what I was doing. I had no idea that he would do anything of that kind. Q. You gave the man at the wheel the order to put his helm aport? A. Yes, sir; to port his helm. Q. Then you had your hand up to the whistle to blow one? A. When he blew two. Q. Then you blew two? A. Yes, sir; I answered him, hard astarboard."

Oscar Hanson, the lookout of the Lakme, testified as follows: "Q. How far from you was the light of the tug which you saw, when you first saw it? A. It was a good mile,—it was about a mile. Q. What lights did you see? A. His mast light,—the tug's mast light. Q. After you saw the masthead light, did you see any other light? A. Just after I reported to the second mate, I got an answer back; he said, 'All right,' and a couple of minutes I see the side lights. Q. What did you report to the second mate? A. I sung out, 'A light on the port bow,—a bright light.' Q. Where was the second mate at that time? A. On the bridge. * * * Q. How long after you reported the light on the port bow, was any signal given by any ship? A. A few minutes after he gave us two whistles. * * * The tugboat gave us two whistles first. Q. What was done then? A. We answered the two whistles back again and turned the wheel over. Q. What way was the wheel turned when the whistle was given? A. I was steering straight; after the whistle came he turned to the port; that called for hard astarboard; it was turned to the port. Q. You put your helm hard astarboard? A. Hard aport. Q. When the two signals came? A. When the two signals came. Q. How was your helm when you first saw the light? A. It was straight;

as far as I could see she was going along straight. After that we kept off to the starboard. Q. What do you mean by 'you kept off to the starboard'? A. Well, when we saw the bright light we kept off. Q. Which way did the Lakme head after the signal blew? A. She was a couple of points or a little off to go clear,—going this way to go to starboard,—and when the whistle blew we turned the wheel and go another way. Q. When you first saw her distinctly she was going toward the starboard, was she? A. Yes. Q. Now, which side was the tug when you first saw her? A. On the port. Q. After the tug blew her two whistles, did she make any change in her course? A. Not before we came close to them, we make the change." On cross-examination: "Q. You saw a light about three points on your starboard bow? A. Yes, sir. Q. Which you took to be a lighthouse? A. Yes. Q. About how far away? A. I don't know how far away it was. Q. Was it farther away than the light of the tug? A. Yes, sir. * * * Q. You saw no light on the land side off your port bow? A. No, sir. * * * Q. When you first saw the mast light of the tug, she was about a mile away? A. Yes, sir. Q. A mile away? A. Yes, sir. Q. About two minutes after that you saw her side lights? A. Yes, sir. Q. You saw both of them? A. I saw the red light first. Q. And about two minutes after you saw her mast light you made out her side lights? A. Yes, sir. Q. And that was about the time that the tug gave the two whistles? A. Yes, sir. Q. Now, how far away do you judge you were when the tug gave the two whistles,—about three-quarters of a mile? A. Not so much as three-quarters. Q. A half a mile? A. About a half a mile. Q. Your vessel immediately answered with two blasts of the whistle? A. Yes, sir. Q. The tug immediately changed her course? A. Not before she saw we had changed our course. Q. You changed your course immediately? A. Yes, sir. Q. And then the tug changed her course? A. Yes, sir. Q. And then you were then about half a mile apart? A. Yes."

Olaf Johnson, mate of the Lakme, testified: "Q. Did you notice how far you were out in the sound when you came up on deck? A. When I got up on deck I should judge—I don't remember exactly—I should judge somewhere about a mile away. Q. A mile from the shore? A. A mile from the shore."

Tennas Olson, the pilot in command of the tug, testified as follows: "Q. Now, did you at any time give her (Lakme) any signals? A. I did. Q. What light was she showing when you gave the signal? A. Showing the green light. Q. About how far out from you was she at the time you gave the signal? A. About a mile or so. Q. What signal did you give? A. Two whistles. Q. What were your reasons for giving that signal? A. Because I wanted to pass her on my starboard bow, because I had a ship in tow and it was more safer for me. I could not go inside, it was not safe to go inside of her. Q. Why was it not safe to go on the inside of her? A. Because I did not think there was water enough, I didn't think. Q. How far were you off shore? A. About three-quarters of a mile; somewhere like that; I passed Point No Point very close. Q. How was the tide at that time? A. Well, the tide changed about just off Point No Point, and it was then about ten minutes after that until I blew my signal and gave the whistle. Q. Which way was the tide then? A. The same tide; going down; and you will always see the tide sets you in on the south shore; on the ebb tide. Q. The ebb tide sets you in toward the shore? A. It sets you in toward the shore. Q. * * * About how much time elapsed, Mr. Olson, after these whistles were blown by the tug and the Lakme before this collision occurred? A. There was about four minutes I should imagine,—about four." Cross-examination: "Q. You were not more than three-quarters of a mile off shore? A. About three-quarters of a mile, as near as I can recollect. * * * Q. Do you know the shore from Point No Point down to Appletree Cove? A. I do. Q. Are there any shoals along that shore? A. Yes, sir. Q. How far do those shoals extend? A. Well, there is a shoal from Point No Point up to Pilot's Point pretty near, a little point there, and there is a shoal right along up there. Q. How far out into the sound does that extend? A. A quarter of a mile or something like that. Q. About how far? A. About a quarter of a mile, I should think. Q. You say the tide had just turned?

A. The tide turned off Point No Point, because I felt the current. Q. You say the tide had just turned before the collision, or when? A. Before the collision. Q. About how long before? A. Well, of course, you could not say exactly; it must have been about half an hour or so. Q. Did you notice when the tide turned? A. Well, I felt the tide when I was going around Point No Point, I felt some ripples on the boat, and you could see in the water; it makes a little move more when the tide turns. Q. You knew the tide had turned as you swung around Point No Point? A. I knew the tide was ebbing then, going the other way. * * * Q. About how far away was the Lakme when you blew the two whistles? A. She was off about a mile, I suppose, * * * as near as I could judge."

Oscar Andresen, the quartermaster of the Tyee, testified: "Q. What course were you steering up to the time when the whistles were sounded, after rounding Point No Point? A. I think we were steering something about south southeast. * * * Q. About how far off shore were you? A. Probably three-quarters of a mile or a mile."

Captain Bailey, master of the Tyee, testified: "Q. How far off shore? A. Not to exceed a mile away, about three-quarters of a mile. * * * Q. What kind of a shore is there along there? A. From Point No Point to Pilot Point the shoal makes out quite a ways before you get to Pilot Point, and before you get to Pilot Point there is large bowlders, and they come out at extreme low water in the summer time. Q. How far from the shore line? A. I should say 100 yards or 200 yards. It runs dry between Pilot Point and Appletree Cove; it runs dry at low water. Q. Is it shallow water some distance from there out? A. It drops off gradually. Q. Now, Captain, having a vessel like the Queen Elizabeth in tow, and the Tyee proceeding on the course which you have described, and seeing the Lakme approaching end on or nearly so, what would you say would be the proper course for the officer in charge of the Tyee to pursue, having in view the safety of his tow? A. Well, in that case I should do as the officer of the Tyee did,—pass to the starboard and give more room. Where he would have more room for his ship. A tug will swing much quicker than a ship would. Q. Would there be any danger in getting close inshore with a light-laden large ship like the Queen Elizabeth? A. There would; yes, sir. Q. How was the tide at that time? A. The tide at that time was ebbing, ebbing on the shore. Q. Would that tend +o set a light-laden vessel like the Queen Elizabeth inshore? A. It would. In other words, in that case, in the case of the Tyee that night, the ship's wheel would have—should have been put hard to port, and after being put hard aport, before they could have recovered her with a starboard wheel, she would have got in onshore; there was not room enough for the ship to turn from the distance to the beach from where the Lakme struck him. Q. That is, if they took the other course? A. Yes, sir; the ship could not have passed inside the Lakme, and recovered himself before she would have been on the beach. She would have to have come off again on the starboard wheel after the wheel was put hard to port, and before he would have time to have done that he would have been on the beach. There was lots of room on the outside; there was most room there."

Captain Fulton, master of the Queen Elizabeth, testified: "Q. Who took charge of the deck when the vessel left Port Townsend in tow of the Tyee? A. I was in charge. I was in charge all the time. Q. Who was at the wheel? A. Conrad Berg. Q. Who was on the lookout? A. Oscar Johnson, an able seaman. * * * Q. Now, I wish you would state when you first saw the Lakme, where you were and about what hour it was? A. It was near four o'clock in the morning, and we were a mile, I think, above Point No Point. * * * I mean, that is, up the Sound, that is, to the southward of Point No Point; and about a mile and a half off our starboard shore I observed a steamboat light about two degrees to our port bow. Q. What lights did you first observe? A. The masthead and red light. Q. Now, at about what distance was she at that time? A. Well, I think about three miles. * * * Q. Now, what, if any, signals did you hear given by your tug to the Lakme? A. Well, shortly afterwards I heard our tug give two blasts. * * * Q. Now, how long before the whistles blew did you first observe the Lakme? A. I could hardly tell, but I was walking backwards

and forwards on the poop. I didn't stop and look at her when I first saw her light. I think she was three miles off anyway, and I did not keep constantly looking at the light. Q. Did you know which whistle it was that blew first? A. Yes, sir; I could see that our boat was the one that blew the first whistle. Q. What kind of a night was it? A. It was a beautiful clear morning,—a moonlight morning,—just break of day. * * * Q. Did you see the Lakme's green light at that time? A. No, sir; I never saw the green light all through the business, not once. Q. Well, then, were you following at that time the exact course of the tug? A. Right after. Q. All the time? A. All the time. Q. And on which side of your ship, the port or starboard, did you observe the Lakme? A. When I first observed her she was about two degrees on the port bow. Q. Two degrees on the port bow? A. Just about two degrees, I could see her— If I was standing amidships she might appear directly ahead; but, me standing on her port side, I could see her just open a little on the port bow. Q. And you saw her red lights? A. I saw her red lights. * * * Q. Do you know about how far away you were from the Lakme at the time those whistles were blown? A. Well, I think we must have been a mile,—in the vicinity of a mile. * * * Q. Were you as far away from the Lakme as you were from the shore on the starboard? A. I think so; yes, sir."

Conrad Berg, an able seaman and boatswain's mate on the Queen Elizabeth, testified: "Q. Were you on the Queen Elizabeth on the 13th day of April last? A. Yes, sir. Q. At the time of the collision with the Lakme? A. Yes, sir. * * * I was standing at the wheel at the time. * * * Q. When did you first see the vessel Lakme? A. The first I saw of the vessel was a bright light ahead, and shortly after I noticed a red light, and a little after that I heard our tug give two blasts, and he was immediately answered by the approaching steamer with two blasts, and our tug starboarded her helm and went to port, and I was steering after the towboat, and starboarded my helm too, and shortly after that I heard the captain holler out, 'Hard aport,' or 'Hard astarboard.' So the steamer came up between the towboat and us, and struck us on the port bow, and as she struck us on the port bow * * * she shot over toward the land. Q. Now, could you see the approaching steamer all the time? A. Yes, sir, I could see her. I can't say how far she was from the ship, but then she came close up to the ship, and I only could notice her masthead light. Q. State whether or not you ever saw her green light? A. No, sir; I never saw the green light. * * * Q. At the time you were struck were you following the tug, directly in line with the tug? A. When the vessel struck us the towboat was a little more on the beam, because we could not swing so fast. Q. That is, you had not got swung fully around? A. No. Q. Now, after she struck you this glancing blow, how was the Lakme heading? A. She was heading for the land, for the land we had on the port quarter. * * * Q. Have you any idea whether, from the Lakme's light, whether the reason you could not see the Lakme's green light was that her course lay to the left of you so far that you could not see it, or whether it was not burning? A. I never noticed any green light. I never noticed any green light on board. Q. From the position of the boats do you think you would have been able to see it if the light had been burning? A. No, sir; not at the time I noticed her first. Q. Her course laid so far across yours that you would not hardly have seen the green light at all? A. Not at first, but then, when she came closer, it might be that I should have seen it then. Q. Now, did you notice the Lakme as it approached the tug particularly; were you keeping watch of the position and of the distance the Lakme was away from the tug all the time? A. No, sir; I did not watch the steamer much. I had to watch the towboat and look out for the steamer too. * * * Q. Have you any idea about how far the vessels were apart when the four whistles were blown? A. It must be that it was between two and three miles."

Oscar Johnson, lookout on the Queen Elizabeth, testified: "Q. Now, when you got down from Port Townsend, did you see any other steamer's light? A. Yes, sir. Q. How far away? A. I could not tell you. Q. What lights did you see? A. Masthead lights. Q. What other lights? A. And a red light. Q. Did you ever see her green light? A. No, sir."

118 F.—62

Nathan H. Frank, Herbert S. Griggs, and Peters & Powell, for appellant.

Struve, Allen, Hughes & McMicken, for appellee Puget Sound Tugboat Company.

Preston, Carr & Gilman and Page, McCutchen, Harding & Knight, for appellee Queen Elizabeth Company.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement of facts, delivered the opinion of the court.

After reading the foregoing statement of facts, it will be observed that the evidence upon many of the material points is conflicting. The testimony upon some of the points cannot be harmonized. It is apparent that some of the witnesses must have been mistaken. The judgment of others was, evidently, expressed without a full knowledge of all the facts. The testimony of witnesses as to distances is frequently variable, and often very unsatisfactory. In some instances it is a mere guess. So in relation to the question as to lapse of time that transpired before the occurrence of certain events, it is often difficult for the court to determine where the truth of the matter lies. When the testimony of the witnesses is taken before commissioners, or by deposition, as in the present case, the court is deprived of the opportunity of seeing them, of judging the weight to be given them by their manner and appearance upon the witness stand, and the opportunity afforded of asking questions concerning doubtful matters, which always materially aids a court or jury in determining the reasonableness of their statements, and affords safe guides for arriving at the probability or improbability of the story they tell. Nevertheless, there are other landmarks that can be taken hold of, weighed in the scales, and balanced up, in measuring their reliability and truthfulness; their opportunity to discern the conditions, their position and opportunity to correctly ascertain the facts, the duties charged upon them by the positions they hold, etc.; and in many cases there are independent facts which tend to shed more or less light upon the testimony of the witnesses.

We are of opinion that the weight of the testimony establishes the fact that the exchange of signals took place about four minutes before the collision, and that at the time the signals were given the steamers were about a mile apart. The admitted rate of speed of the steamers indicates, as strongly as the testimony of the witnesses, that at the time the signals were given the steamers must have been about one mile apart. The testimony also supports the position that the vessels were about one mile from shore. The testimony also establishes the fact that the Lakme must have been steering an irregular course. The fact that at the time the signals were given the Lakme was showing her green light is positively testified to by Olson, the pilot, and Andresen, the quartermaster of the tug Tyee. These men were at their posts of duty; they had the opportunity to observe; they must have known the facts. The pilot was charged

with the important duty of directing the course of the tug in such a manner as to save not only his own tug but also the steamship which the tug had in tow. Surely he would look and see the position of the Lakme before he gave the signals. Their testimony is not impeached, and it is the duty of the court to accept it as true unless there are other circumstances which question its correctness. The mere fact that the officers of the Queen Elizabeth did not see the green light of the Lakme does not impeach, or tend to impeach, the testimony of these two witnesses, and is not in any manner inconsistent therewith. The fact that none on board the Queen Elizabeth saw the green light is sufficiently explained in the testimony. They were following the course of the tug and looking after their own steamer. When the course of the tug and steamer is taken into consideration, it will be seen that the steamer was following the tug on a hawser 600 feet in length when rounding Point No Point; the Tyee would naturally change its course much quicker than the steamer; hence it would necessarily follow that when the tug changed her course the steamer would vary its course, because she could not respond as readily, and in rounding the point would keep in nearer the shore. The tug would swing much more quickly than the ship.

With reference to Guilfoyle and Hanson, of the Lakme, we have given their testimony at greater length than others. It speaks for itself. It need not be discussed at length; it is neither clear nor convincing, and in our judgment is not entitled to as great weight as the testimony of Olson and Andresen.

Appellant invokes the law of the road to show that the tug Tyee was at fault in giving the signals and then changing its course. Whether the tug was at fault, or the law of the road applies, depends upon the facts of the case. If the signals were given in ample time to make the change without any danger of collision, the tug Tyee, having received the consent of the Lakme, had the right to act as it did. The channel was wide enough for both vessels. They were one mile apart; there was no danger of collision if both vessels promptly complied with the signals agreed upon. There is no pretense that the tug was in any manner at fault except in giving the signals. Appellant does not deny the proposition that, on a body of water five miles or more in width and navigable almost from shore to shore, vessels approaching from different directions are not prohibited from navigating in any direction that will not interfere with the course of the other vessel, unless so situated as to come within the law of the road.

The facts in this case fail to show any breach of the statute upon the part of the Tyee which would, as claimed by appellant, bring it within the settled rule announced in Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264, 37 L. Ed. 1218, "that, when a vessel has committed a positive breach of statute, she must show not only that probably her fault did not contribute to the disaster, but that it could not have done so." At the time the signals were given there was no danger of collision. The tug, having a large steamship in tow and being within a mile of the western shore, where there were more or less shoals, and with an ebb tide, the current setting in strongly

against the western shore, there might be danger for his tow; and it was deemed safer and less dangerous to change its course and go to the left. The signal was given, and immediately assented to by the Lakme, and when this consent was given the Tyee put its helm astarboard and proceeded to the left in compliance with the signal. The Lakme, in porting her helm in the manner which she did, after she had assented to the two whistles, was certainly at fault. The Minnie R. Childs, 9 Ben. 200, Fed. Cas. No. 9,639; The Richmond (D. C.) 28 Fed. 332; The Sammie (C. C.) 37 Fed. 907; Kiernan v. Stafford (C. C.) 43 Fed. 542; The Nutmeg State, 14 C. C. A. 525, 67 Fed. 556; City of Macon (D. C.) 85 Fed. 236. The Lakme was at fault for being too slow in putting her helm hard astarboard, after assenting to the signal of the Tyee, which indicated that the vessels were to pass each other starboard to starboard.

It will be noticed from the testimony that all the witnesses on board the Tyee testified that the Lakme proceeded under a port helm from the time the signals were exchanged until she was nearly opposite the Tyee. Upon this point we did not quote, in the statement of facts, the testimony of Captain Fulton of the Queen Elizabeth. The record shows that he testified, upon cross-examination, upon this point as follows:

"Q. At that time you and the Lakme were approaching directly head on, were you not? A. I could not tell you whether he was approaching direct, but I was swinging off on an angle, and it appeared to me that he must have been swinging— I was swinging on an angle from south southeast to east, and it appeared that he must have been swinging on an angle from northwest to north. * * * I was swinging to port on my starboard helm, and he kept coming about on the opposite direction, and he must have been swinging to starboard on the port helm, otherwise he would have gone clear of me; if he ported his helm he would have cleared me."

The log of the Queen Elizabeth, after mentioning the fact that the lights of the Lakme were discovered off Point No Point, contains the following:

"A few moments after our tug gave two blasts with its whistle, which was immediately answered by the approaching steamer, two blasts. Our tug at once starboarded his helm, and our helm was also starboarded to follow the tug. The tug was noticed to be going to port very fast, and our helm was ordered by master to be put hard astarboard. The approaching steamer did not seem to alter her course to port, but came directly between our tug and ship; struck us a very heavy glancing blow on the port bow."

Appellant contends that the vessel which is first to depart from the rules takes upon herself the risk of passing in safety, and, failing in the maneuver, the law holds her in fault. The Oceanic (D. C.) 61 Fed. 338, 352, and authorities there cited. We have already stated that the situation of the vessels—one mile apart—at the time the signals were exchanged did not make the rule of the road applicable. Moreover, it is not shown that the Tyee failed to execute the maneuver she undertook in changing her course in accordance with the signals she had given. It is manifest from the testimony that, if the Lakme had done nothing to embarrass the Tyee, the collision would not have occurred. Our conclusion is that the Tyee was free from fault, and that the Lakme alone was blamable for the collision.

The decree of the district court is affirmed, with interest and costs.